### KERR v. MILWAUKEE MECHANICS' INS. CO.

(Circuit Court of Appeals, Eighth Circuit. August 25, 1902.)

No. 1,706.

**1. FIRE INSURANCE—ACTION ON POLICY—ESTOPPEL.**

In an action on a fire insurance policy defendant is not estopped, by a notice given plaintiff denying liability on the ground that the property was not in existence when the policy was delivered, from proving that a prior policy of another company covering the same property, which was to be replaced by defendant's policy, had not been canceled when the property was burned; the two defenses being entirely consistent.

**2. SAME—SUBSTITUTION OF POLICIES BY AGENT—DELIVERY AFTER DESTRUCTION OF PROPERTY.**

An insurance agent wrote a policy in a company represented by him, which he intended to substitute for a subsisting policy in another company, which had demanded an increased premium, but had taken no steps to cancel its policy. The agent marked the first policy "Canceled" in his books, and transferred the credit for the premium paid, but the second policy was not delivered, nor was the intended substitution known to the insured (who still held the first policy), nor to either company, until after the property had been destroyed by fire. *Held*, that the first

policy remained in force, and liability thereunder became fixed by the destruction of the property, and that the second policy did not become effective as a valid contract of insurance by its subsequent delivery by the agent.

In Error to the Circuit Court of the United States for the District of Nebraska.

The plaintiff in error (plaintiff below) was the owner of a frame, steam-power grain elevator and fixtures of the value of more than $4,000, situate on a railroad right of way at Western, Neb., which he had leased to the firm of Rundberg & McCann at a monthly rental, and an agreement on the part of the lessees to keep the property insured in plaintiff's name, and for his benefit, against loss and damage by fire. In November, 1899, said lessees procured the property to be so insured for and in the name of the plaintiff for one year, for the sum of $4,000, by a policy of insurance of the Hanover Fire Insurance Company of New York, issued by U. S. Rohrer, who was then the recording agent at Hastings, Neb., of that insurance company, and also of the other insurance companies hereinafter mentioned. Said lessees paid the premium for such insurance, and the policy was delivered to and accepted and kept by the plaintiff. On the expiration of that policy in November, 1900, said property was again, at the request of said lessees, insured for another term of one year in the same sum of $4,000 by a policy in the Phenix Insurance Company of Brooklyn, issued by said Rohrer, as its agent, on the payment therefor by said lessees of a premium of $80, being 2 per cent. of the amount of the insurance. Said policy was also issued in the name of the plaintiff, and delivered to and kept by him. Afterwards, on December 8, 1900, Mr. Coryel, the state agent in Nebraska of said Phenix Insurance Company, conferred with said Rohrer and with Mr. McCann, one of said lessees, and informed them that, unless the rate of the premium for insurance upon said policy of the Phenix Insurance Company was increased to 2½ per cent., and a "query sheet" furnished, such policy would be canceled. No definite agreement was reached in respect to this matter, other than may be inferred from the following testimony of Mr. McCann, who was a witness for plaintiff: "Q. You had a talk with Mr. Coryel, the general agent of the Phenix Insurance Company, along about the 8th day of December, 1900, did not you, Mr. McCann? A. Yes, sir. Q. And at that time he told you that the Phenix policy could stand at 2½ per cent., subject to your furnishing some sort of a query sheet, didn't he? A. I am not positive about the exact words, but he told me the rate would have to be raised. He says, 'I have raised Mr. Ferguson's,' and I think 2½ is the rate he agreed to let it stand at, provided we furnished the query slip. Q. Did they ever furnish you that query sheet? A. I think not. We were to furnish it. They never furnished me the blank to fill out. They were out of them at the time, and Mr. Coryel agreed to send them to Mr. Rohrer, and he was to send them to me. Q. And the policy was to stand, Mr. Coryel told you, until they should send you the query sheet, or in substance that? A. As far as they were concerned." On Monday, December 10, 1900, McCann came to Rohrer, and asked if he could not place the insurance in some other company at the rate at which it had been written, and save him from paying the increased premium, and was told by Rohrer that the Milwaukee Mechanics' Insurance Company had shown him some favors, and possibly might be got to carry the risk at the old rate. McCann then told Rohrer that he wished Rohrer would make an effort to place the insurance in that company, "or somewhere," if possible, to save him the increased premium. Nothing more was done about the matter by any one until Wednesday, December 12, 1900, when, without notice to anybody, Rohrer caused his office assistant to prepare and fill out the policy of defendant company on which this action is brought, and Rohrer countersigned the same as defendant's agent, and placed it in his safe, with the intention of afterwards delivering it to plaintiff on the surrender to him by plaintiff of said policy of the Phenix Insurance Company. On Saturday, December 15, 1900, Rohrer, by letter, reported to defendant company the making of its policy, which letter was received on December

17, 1900, when defendant at once telegraphed to Rohrer to cancel the policy. Other facts are concisely stated in the testimony of Rohrer, a witness for the plaintiff, as follows: "Q. After the policy was written, what did you do about the premiums? A. Well, in the course of business, of course, the premiums were transferred from one company to another on my books. The Milwaukee Company was credited with the $80 premium, and the Phenix was charged with it. Q. You had that money in your own hands at that time? A. The money had been paid to me in November. Q. And still remained with you? A. Yes, sir. Q. Now, what did you do with the Phenix Insurance Company's policy? A. I did not do anything. Sunday morning, the 16th of December, 1900, while I was in my office, Mr. McCann came in, and said: 'We have had bad luck,' and I said 'Why?' He said that the elevator at Western had burned that morning. I said, 'Is that so?' And he asked me, 'Did you make that change?' And I said, 'Yes'; that I had written the business in the Milwaukee Mechanics', but I said, 'I still have the policy in my possession; I have never delivered it.' I questioned him in regard to the fire, and found that he knew merely that there was a fire; had been a fire or was a fire; didn't know the particulars or circumstances. So I waited until Monday morning—the following morning—to learn more particulars about it before sending in any advices; and Monday morning I advised the Milwaukee Mechanics' of the loss,—both the Milwaukee office and Mr. Freeman at Omaha. When the bank opened in the morning, I took the Milwaukee Mechanics' policy down to the bank, and told Mr. Kerr that it had become necessary to take up the Western policy again, and replace it with a new one, and he took the policy, and handed it to Mr. Schrek, and told him to get me the other policy. Then I turned to Mr. Kerr. I was astonished that he did'nt say something about the fire, and I said to him, 'Have you heard the news?' He said, 'No, I hadn't heard any news.' I said, 'The elevator at Western had burned.' He said, 'Is that so,' and he then said,—I do not know whether I can give his exact words or not, but something to this effect: 'How about this?' or something about 'Hadn't I better keep this policy?' Mr. Schrek was standing there at the time, with both policies in his hands, and I said, 'I do not know.' This Milwaukee Mechanics' policy had been written by me on Wednesday, to take up the Phenix policy, so he directed Mr. Schrek to give me the Phenix policy, and I took it to my office, and put it in the safe." Mr. Rohrer also gave the following testimony on his cross-examination: "Q. Now, at the time of the writing of the policy in suit, which you say was on the 12th, it was written by your clerk and countersigned by you on that date? A. Yes. Q. It was then placed in your safe? A. Yes. Q. Did you at that time notify Mr. Kerr of the writing of this policy? A. No, sir. Q. Had he ever said anything to you about the writing of the policy in the Milwaukee Mechanics' Company? A. No, sir. Q. Had you ever had any conversation with him at that time in which you informed him of any cancellation on your records of the Phenix policy then held by him? A. No, sir. Q. Did you at that time, or prior to the 16th day of December, notify McCann or Rundberg & McCann of having written policy in the Milwaukee company? A. No, sir. Q. Did you at any time prior to the 16th of December, after McCann had informed you of the fire, notify Mr. McCann or Rundberg & McCann that you had written upon your policy register a cancellation of the Phenix policy? A. No, sir. Q. Did Mr. McCann, or Rundberg, or Mr. Kerr, or any of them, ever tell you to cancel the Phenix policy prior to the time when you delivered the Milwaukee policy to Mr. Kerr at the bank on the morning of the 17th of December? A. No, sir. Q. What was the form of the Phenix policy? Was it the usual standard New York form? A. Yes. Q. And was it substantially the same as the policy in suit? A. I think it was identical in form outside of the officers, and everything like that, and the title of the policy. Q. At the time on the 17th of December, or prior to that time, had you received any instructions from the Phenix Insurance Company of Brooklyn, or any of its authorized agents, instructing you to cancel the Phenix policy, after the conversation you have related between Mr. McCann and Mr. Coryel? A. No, sir. Q. Now, when Mr. McCann came to your office, Monday, the 10th of December, did he direct you to write any policy in the Milwaukee Me-

chanics' Company? A. No, not in words, he didn't. Q. Did you at that time agree with him, or say to him, that you would write a policy in the Milwaukee Mechanics' Company? A. No, sir; I do not think I did." There was no contradictory testimony in the case. To the plaintiff's petition seeking to recover on said policy of defendant company the defendant answered, alleging that such policy was written at its date by defendant's agent at Hastings, Neb., with the intention of offering the same to plaintiff in exchange for the surrender of an outstanding policy of insurance of the Phenix Insurance Company of Brooklyn, which continued in force when the property was burned, and that defendant's policy was not so exchanged or delivered to plaintiff until after the property had been destroyed; and never became effective. At the close of the testimony the jury, by direction of the court, returned their verdict in favor of defendant, and judgment was rendered accordingly.

John M. Ragan (J. B. Cessna, on the brief), for plaintiff in error.
C. C. Wright (John F. Stout, on the brief), for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

LOCHREN, District Judge, after stating the case as above, delivered the opinion of the court.

1. Defendant was not estopped by its notice to plaintiff, in which it denied liability on the ground that the property described in its policy was not in existence when such policy was delivered, from proving that the policy of the Phenix Insurance Company covering the same property had not been canceled when the property was burned. These matters are so far from being inconsistent that proof of the one almost necessarily proves the other, and no element of an equitable estoppel is even suggested.

2. In this case there is no claim that there was, prior to the execution of the written policy of the defendant company, and its delivery to and acceptance by the plaintiff, any verbal agreement on behalf of that company to insure the property, which might make the contract of insurance take effect before the delivery of the written policy, and render that writing only the better evidence of the terms of the contract which the parties had agreed on. City of Davenport v. Peoria Marine & Fire Ins. Co., 17 Iowa, 277. If, therefore, at the close of the testimony, it clearly appeared that the written policy of the defendant company had not, at the time of the burning of the elevator, become, by delivery and acceptance, a completely binding contract, then the defendant company never incurred any liability as insurer, and the court's direction to the jury was proper; otherwise it was not. As all the evidence shows that the policy of the defendant company was not intended as a new or additional insurance of the property, independent of other existing insurance, but was intended only to take effect upon the surrender or cancellation of the outstanding policy of the Phenix Insurance Company, which policy it was to replace and become substituted for, it becomes important to consider the status of the Phenix Company's policy at the time of the fire, as it is certain that the two policies were not in force at the same time. The policy of the Phenix Company was issued in November, 1900, insuring this elevator property for one year. It is admitted that it was valid and binding. It could

only terminate "by the expiration of the risk, by the agreement of the parties, or by some means provided by the contract." Massasoit Steam Mills v. Western Assur. Co., 125 Mass. 110, 114. It did not terminate by lapse of time, as it had about 11 months to run at the time of the fire. It was not terminated by the means provided by the contract, which was by giving five days' notice of cancellation and returning the unearned portion of the premium. This notice of cancellation and return of premium must be to the insured, and not to the agent who procured the insurance, and whose authority is executed and exhausted by the procurement of the insurance. Insurance Co. v. Nill, 114 Pa. 248, 6 Atl. 43. But though the state agent, Coryel, expressed a purpose to cancel the policy of the Phenix Company unless a higher premium was paid and query sheet furnished, he took no steps toward such cancellation; and his conference with McCann ended with the expectation, at least on his part, that the policy of the Phenix Company would be continued by McCann's compliance with his demands. Two days later the conversation between Rohrer and McCann shows that the latter still expected to pay the additional premium and retain the Phenix Company's policy, unless Rohrer should succeed in inducing the defendant or some other company to consent to assume and carry the risk at the old rate. Up to the end of this conference between Rohrer and McCann on December 10, 1900, there was certainly no termination of the policy of the Phenix Company by any agreement of the parties, nor any insurance, or agreement to insure, on the part of the defendant company. The plaintiff, who was insured by the Phenix Company's policy, which he had in his bank, and without whose consent it could not be surrendered nor invalidated except by the five-days notice of cancellation and return of unearned premium, had no notice or information that its cancellation or replacement by other insurance was even being considered by anyone.

From that time until after the destruction of the elevator property by fire on December 16, 1900, there was no agreement between the parties for the surrender or cancellation of the policy of the Phenix Company, nor for the insurance of the property by policy of the defendant company in substitution for the insurance by the Phenix Company. Nothing was done about the matter in the meantime except what was done by the insurance agent Rohrer alone, without conference with or direction from either the plaintiff, or the Phenix Company, or the defendant company. On December 12, 1900, he caused his clerk to fill out the policy in suit of defendant company, and countersigned it as agent of that company, and placed it in his safe. On September 15th he advised defendant company by letter of the making of this policy, and was promptly, by telegraph, directed to cancel it. He did not deliver it to plaintiff, nor seek to take up the policy of the Phenix Company, until one day after the property was destroyed by fire. The claim of the plaintiff now is that, when defendant's policy was written and countersigned, and the agent of the insurance company noted on his books a transfer of the premium, and that the Phenix Company's policy was canceled, the last-named policy thereby became canceled and terminated, and the policy of

defendant company in force, and held by Rohrer as plaintiff's agent. Many cases hold that an agent of fire insurance companies to issue their policies may also be constituted by the insured his agent to receive the policies, and to keep and care for them, with plenary power to keep the property insured in accordance with general directions of the insured, and attend to all renewal, cancellation, and replacement of insurance, without consulting the assured in respect to particular policies or other details. Hamm Realty Co. v. New Hampshire Fire Ins. Co., 80 Minn. 139, 83 N. W. 41; Dibble v. Assurance Co., 70 Mich. 1, 37 N. W. 704, 14 Am. St. Rep. 470; Buick v. Insurance Co., 103 Mich. 75, 61 N. W. 337. In those cases such had been the course of dealing between the insured and the agent for a term of years. Here no such authority is shown; nor was there any course of dealing shown from which such unusual authority can be presumed; and the conversation between plaintiff and Rohrer when the policies were exchanged after the fire shows that no thought of the existence of any such authority was in the mind of either. Rundberg & McCann were bound to keep the property insured and pay the premiums. They procured the insurance through Rohrer, but it had to be to the satisfaction of the plaintiff, the insured; and policies had been always delivered to and accepted and retained by him. He could refuse any policy offered that was not satisfactory to him. And when, in response to McCann's inquiry after the fire, as to whether any change had been made, Rohrer stated that he had written the business in the Milwaukee Mechanics', his further statement, "I still have the policy in my possession; I have never delivered it," indicates strongly that at the moment he regarded the transaction as incomplete. "An agent of an insurance company has no authority to insure property already destroyed; and a policy written and intended as a substitute for a subsisting policy in another company, but not delivered, and of which the assured has no knowledge until after the property is destroyed by fire, is not a valid contract of insurance." Stebbins v. Insurance Co., 60 N. H. 65. To the same effect, see Hermann v. Insurance Co., 100 N. Y. 411, 3 N. E. 341, 53 Am. Rep. 197; Insurance Co. v. McKenzie, 70 Ill. App. 615; Insurance Co. v. Turnbull, 86 Ky. 230, 5 S. W. 542. These cases hold that the written but undelivered policy never matured into a contract for insurance, and that liability upon the subsisting policy which was intended to be replaced was fixed by the burning of the property while it was still in force. The acts of bookkeeping of Rohrer in marking cancellation on his office record of the Phenix Company's policy and transferring in his accounts the credit for premium from that company to the defendant company, all done in anticipation of his purposed delivery of defendant company's policy in replacement for the expected surrender of the policy of the Phenix Company, were futile, and affected no existing rights or liabilities. Insurance Co. v. Turnbull, 86 Ky. 230, 237, 5 S. W. 542; Insurance Co. v. McKenzie, 70 Ill. App. 615, 623. In the present case it clearly appeared that at the time of the burning of the elevator the policy of the Phenix Insurance Company was a valid contract of insurance, which had never been surrendered nor canceled; and that plaintiff, the insured, then held it as such.

The policy of the defendant company was then an undelivered writing, not yet a contract, and because of the destruction of the property while it was in that condition it never became a contract.

There was no error in directing the verdict for the defendant, and the judgment is affirmed.