## JOHN R. LUCAS V. STATE OF NEBRASKA.

### FILED NOVEMBER 22, 1905.   No. 14,218.

1. **Criminal Law: CHANGE OF VENUE: DISCRETION.** The constitution guarantees to every person charged with crime a trial by an impartial jury. If there is such a prejudice in the minds of the people of the county against the defendant, or such a firm conviction of his guilt of the crime charged against him that there is substantial and well-founded reason to believe that he cannot obtain a fair trial in the county, the constitution requires that the venue be changed. The trial court must exercise discretion in determining these facts, but has no discretion to refuse the change of venue when these facts appear. ·

2. ——: ——: ——. The determination of the trial court upon an application of the accused for change of venue will not be disturbed, unless it appears from the record that its conclusion is wrong. Its discretion in the matter is a legal and not an arbitrary one.

3. **Continuance.** The defendant in a criminal trial is not prejudiced by the denial of his application for continuance upon the ground of absence of material witnesses, if the matters to be proved by the evidence of the absent witnesses are conclusively established upon the trial by other witnesses and are not controverted by the state.

4. **The guaranty** of the constitution that in all criminal prosecutions the accused shall have the right of trial by an "impartial jury" should be carefully guarded by the courts. It is not competent for the legislature to limit or modify this right.

5. **Jurors: COMPETENCY.** Section 468 of the criminal code provides that a juror who is prejudiced against the accused is not competent; nor is one who has an opinion as to the guilt or innocence of the accused, unless he says on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence.

6. ——: ——. A juror who has an opinion as to the guilt or innocence of the accused, from whatever source he has acquired the information on which that opinion is based, is not rendered competent by the mere fact that he says, on oath, that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence. It must affirmatively appear from the whole evidence, upon a fair examination, that he is impartial.

7. ——: ——. The court must be satisfied that the juror is im-

partial. This means that the whole evidence, in the light of the circumstances, including the conduct and demeanor of the juror, must show affirmatively that the juror is impartial.

8. **Verdict: Evidence.** In criminal trials, the verdict of guilty is not supported by the evidence, unless each element of the crime charged is proved beyond a reasonable doubt. A finding of malice or criminal intent must be derived from the facts proved, and not from conjecture.

Error to the district court for Phelps county: Ed L. Adams, Judge. *Reversed.*

*H. M. Sinclair, S. A. Dravo* and *J. L. McPheely,* for plaintiff in error.

*Norris Brown, Attorney General,* and *W. T. Thompson, contra.*

Sedgwick, J.

The defendant was tried in the district court for Phelps county upon an information charging him with murder in the first degree. The jury having by their verdict found him guilty as charged, he was sentenced to imprisonment for life, and brings the proceedings to this court for review upon petition in error.

1. The defendant made an application for a change of venue. The application is supported by a large number of affidavits. These affidavits are mostly in substantially the same or a simliar form, and, with few exceptions, it is stated in each affidavit that the affiant has heard a great deal of talk concerning the alleged offense with which the defendant is charged, and that the matter has been generally talked about and thoroughly canvassed in the community where the affiant resides; that affiant knows that there is a strong prejudice against the defendant, and believes that the prejudice is so strong and so universal that it would be impossible for the defendant to have a fair and impartial trial before any jury of citizens of the county. These affidavits are from residents of various townships in the county, and in some of them the affiant

states that he is thoroughly acquainted throughout the whole county. The leading counsel for the defendant in his affidavit shows that he is well acquainted throughout the county, and that he was present at the preliminary examination of the defendant, and there "discovered an intense, bitter feeling against the defendant"; that he has taken pains to investigate the cause thereof, and finds that it is based upon prejudice which is generally entertained against the defendant, and that on account of such prejudice the defendant cannot receive a fair and impartial trial in the county; that he has talked with numerous citizens relative to their making affidavits of said feeling, and has been generally refused. Some of the refusals were based upon the avowal that the defendant did not deserve a fair trial; others on the ground that the making of such affidavit might injure their business. He further says that from his experience he believes that a trial of the cause in that county would be a farce, instead of a fair and impartial trial, as guaranteed by the constitution. Quite similar facts are testified to in other affidavits of defendant's attorneys. Affidavits were filed in opposition to the motion, and, although their number was greater, they are quite similar in form and in the manner of presenting their facts to those already noticed. Each affiant testifies that he is acquainted in the county or in some particular township of the county, and that he knows the feeling of the people in regard to the case in question, and that there has been but little talk in the immediate neighborhood of the residence of the affiant in regard to the matter, and that affiant does not believe that there is any bias or prejudice against the defendant, and feels confident that there would be no doubt of readily getting a fair and impartial and unbiased jury in that county to try the case. The witnesses upon both sides, as far as the affidavits show, would appear to be honest in their convictions. We do not think that the affidavits, taken altogether, make it appear that the trial court erred in the exercise of its discretion in overruling the application. The constitution

guarantees to each citizen a fair and impartial trial when charged with crime, and it is the duty of the trial court to see that this guaranty is effective. If there is such a prejudice in the minds of the people of the county against the defendant, or such a firm conviction of his guilt of the crime charged against him, that there is substantial and well-founded reason to believe that he cannot obtain a fair trial in the county, the constitution requires that the venue be changed. Where these facts appear, there is no discretion in the matter. The trial court must grant the change. The discretion of the court is in determining these facts. It is, of course, a legal and not an arbitrary discretion. The determination of the trial court upon this question will not be disturbed, unless it appears from the record that its conclusion is wrong. It would be a difficult matter to determine solely from the affidavits in this record whether there was or was not such a prejudice against the defendant in Phelps county as might reasonably be expected to prevent a fair trial, and, when we consider the advantages of the trial court in passing upon this question, it seems clear that it is not the duty of this court to interfere.

2. An application was made by the defendant for a continuance. It is insisted that the court erred in overruling this application. To determine this question, it is necessary to bear in mind the issues of fact that were being contested by the parties. The defendant was charged with murder in the first degree. The homicide was admitted, and the defendant attempted to show that the killing was done in self-defense. The continuance was applied for upon the ground of the absence of two witnesses whose evidence, it was claimed, was material upon the question of self-defense. In the affidavits filed for the defendant it is shown that both of these witnesses, if present at the trial, would testify that the deceased immediately before the homicide had made threats against the defendant; that the deceased stated to the witnesses that the defendant owed him money and refused to pay it, and that

he, the deceased, did not propose to waste any money or time in attempting to collect it by law, "but would take it out of the hide" of the defendant, and that the deceased at this time, being in great anger, declared to the witnesses, "unless Lucas pays me what he owes me, I will kill him as sure as I am here," and also told the witnesses to inform Lucas of this fact; and that the witnesses just before the homicide did inform the defendant of these threats made against him. Of course, this evidence was material to the issue being tried, and we are satisfied from the showing made that the defendant was not so lacking in diligence as to justify refusing him a continuance upon that ground. It is, however, urged in answer to this contention that the proposed evidence of these two witnesses would, if offered upon the trial, have been cumulative only, and that the evidence of threats of the same nature was so strong in the record that further evidence upon that point was wholly unnecessary, and could not have been of any use to the defendant. This view seems to be justified. There could have been, under the evidence received upon the trial, no doubt in the minds of the jury that the deceased had made the strongest possible threats against the defendant, and that the defendant was aware of these threats at the time of the homicide. The testimony upon this point will be again referred to in the consideration of the objection that the evidence is not sufficient to support the verdict. We are satisfied that no injury resulted to the defendant from the absence of these two witnesses, and that the defendant has not been prejudiced by the refusal of the court to grant his application for a continuance.

3. The objection to the competency of some of the jurors is a more serious one. Section 11 of article I of the constitution is in these words: "In all criminal prosecutions the accused shall have the right to appear and defend in person or by counsel, to demand the nature and cause of accusation and to have a copy thereof; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf; and a speedy

public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." No one of these enumerated rights of the defendant in a criminal prosecution is of more importance than the right to have a speedy public trial "by an impartial jury." No legislation could be valid that in any manner limits or modifies this right. The statute provides that, although a juror may show that he has formed an opinion as to the guilt or innocence of the accused, still, if that opinion is "founded upon reading newspaper statements, communications, comments, or reports, or upon rumor, or hearsay, and not upon conversations with witnesses of the transactions, or reading reports of their testimony, or hearing them testify, and the juror shall say, on oath, that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that said juror is impartial, and will render such verdict, may, in its discretion, admit such juror as competent to serve in such case." Criminal code, sec. 468. This statute, if rightly construed, is a correct interpretation of the constitutional provision. Unless the juror shall say on oath that he feels able, notwithstanding such opinion, to render an impartial verdict, he cannot be retained upon the panel, and if he does so say, upon oath, the court still cannot retain him, unless satisfied that the juror is impartial and will render such verdict. The rule is correctly stated in *Basye v. State*, 45 Neb. 260, 276, in these words:

"A juror, who upon his *voir dire* discloses that he is biased or prejudiced, or who has a fixed and settled conviction or opinion as to the guilt or innocence of the defendant based upon mere rumor, or the reading of the public press, or founded upon conversations with witnesses of the transaction, is incompetent to serve, and should be rejected, even though he may upon his examination state that he feels able 'to render an impartial verdict upon the law and the evidence.' This is the true test of disqualification within the meaning of the statute. If upon the

whole examination of the juror it is manifest that the opinion formed by him from reading newspaper accounts of the alleged crime or upon rumor is merely hypothetical, or conditional on the truth of the rumor or the newspaper reports read; that he has no settled opinion as to the guilt or innocence of the accused, and that he can render a fair and impartial verdict upon the evidence adduced on the trial, under the instructions of the court, the juror is competent."

The examination of the juror made by the court should be with the view of ascertaining the condition of his mind, and whether in reality he is an impartial juror. To so frame the questions as to lead the juror to say that he is disinterested, and that he can and will render a fair and impartial verdict upon the evidence under the law, as stated in the instructions of the case, is not enough. It would frequently happen that a juror, who is himself conscious of being prejudiced against the defendant, or of having a settled conviction of the guilt or innocence of the defendant, may be so questioned by the court as to lead him to make formal statements, which, if taken by themselves alone, appear upon their face to justify his retention.

August L. Johnson, who was one of the jurors, is now alleged to have been incompetent. Upon his direct examination by the attorney who was prosecuting in behalf of the state, he answered that he had resided in Bertrand for 22 years; that he was not acquainted with either the deceased or the defendant; that he was not present at the preliminary examination, and had not talked with any one who knew or claimed to be a witness in the case. The prosecuting attorney then asked him: "Do you know of any reason why you could not sit as a fair and impartial juror in this case?" and he answered: "Well, I have heard considerable." "Q. That has been from newspapers and talk? A. Yes; and talk and things in general." He was then asked whether he believed that, notwithstanding what he had heard, he could sit in the case and render a ver-

dict as fairly and impartially as though he had never heard of the case, "just try it on the law and the evidence right here in the court room," and he answered: "I think so." "Q. That wouldn't influence your verdict, what you have heard and read? A. I think not. * * * Q. Have you at the present time any opinion as to the guilt or innocence of the defendant? A. Yes, I have. Q. When I ask you that question, I don't mean to ask you whether it is your opinion in regard to whether somebody is killed, or who killed him, but whether the party charged is guilty of the murder or not. That opinion you have is formed exclusively on newspaper reports and talk? A. Yes, sir. Q. Notwithstanding that opinion, you think you could sit in this case and render a fair and impartial verdict upon the law and the evidence here in court? A. I think so. Q. If selected as a juror you would try it on the law and the evidence here? A. Yes, sir." Defendant's attorney then cross-examined him briefly, and in that examination he stated that there had been talk among the people; that he had not heard a great deal because his time was occupied, but from what he had heard he had formed an opinion, and that it would require evidence to remove that opinion. The court then questioned him, and the juror answered the court as follows: "Q. I understand you haven't talked with any witness in the case, so far as you know? A. No, sir. Q. You haven't talked with anyone who purported to know the facts in the case of their own knowledge? A. No, sir; I have not. Q. What you have heard talked was the common talk that was prevalent in your town, discussing the matter? A. Yes, sir. Q. Commonly called hearsay— what one heard somebody else say—was that the nature of it? A. I think so. Q. You have read the papers? A. I read an account of it in the Bertrand paper of how it took place. Q. Did this account purport to give the testimony taken at the preliminary examination? A. No, sir; it was just after it happened. Q. And upon that you formed an opinion as to the guilt or innocence of the de-

Lucas v. State.

fendant? A. Yes, sir. Q. Notwithstanding the opinion that you have formed from what you have heard and what you have read, do you feel that, if you were retained as a juror in this case, you could render a fair and impartial verdict on the evidence as introduced here in court and the instructions that might be given you? A. I think I could; yes, sir. Q. And, if chosen as a juror, would you do that? A. Yes, sir. Q. Uninfluenced by what you have heard or read? A. Yes, sir." The challenge was then overruled by the court, and the defendant's attorney cross-examined him further, and he answered as follows: "Q. The opinion that you have formed was as to the guilt or innocence of the defendant? A. Yes, sir; it was. Q. That opinion, then, as I might say, was as to the guilt of the defendant? (Not answered.) Q. You have that opinion now, haven't you? A. Yes, sir. Q. And that is such as would require evidence to remove it? A. It would. Q. You couldn't start in on the trial of the case, then, as a juror, just the same as though you had never heard about the case? A. Well, I don't just think I could. Q. Now, in other words, if chosen as a juror, Mr. Johnson, as a juror, in the commencement of the trial, you would remember what you have heard, and you would have that impression in mind as to the guilt or innocence of the defendant, and it would require evidence to remove that? A. Yes; it would require evidence to remove that. Q. You would start in the trial of the case, as a juror, if chosen, with that impression and opinion on your mind? A. Certainly." The court then questioned, and the juror answered as follows: "Q. But you told me, notwithstanding the opinion that you have, based upon what you have heard and what you have read, yet, if retained as a juror, you feel that you could render a fair and impartial verdict under the evidence, as introduced in court, and the instructions given you by the court? A. Yes; because I haven't heard only this hearsay. Q. And disabuse your mind of what you have heard? A. Yes, sir. Q. That wouldn't enter into your deliberations upon a final determination of the

case at all? A. No, sir; it would not." The challenge of the defendant to the juror was then overruled, and the defendant excepted.

When the juror had upon examination of the defendant shown himself to be clearly incompetent, the court proceeds with the juror in language rather in the nature of positive statements than of interrogatories for the purpose of ascertaining the candid opinion of the juror, and determining from the whole evidence whether the juror was disqualified. Such a mode of questioning a juror was not calculated to bring out evidence upon which the court might fully determine whether or not there was an abiding prejudice in the mind of the juror against the accused, or whether there was, in fact, a conviction in the mind of the juror as to the guilt of the accused which would, in some part at least, neutralize the circumstances that might be brought before him tending to justify the accused. The apparent object of such an examination is to obtain from the juror a statement that he is impartial. The juror himself probably so understood it, and human nature is such that very few jurors would fail to declare themselves impartial if they were aware that it was the desire of the court that they should so declare; but, as before seen, such a declaration on the part of the juror is not enough. He must be able at least to so declare, but such declaration by him is not decisive of the question. The implication of the statute is that the juror who makes such declaration may himself be mistaken, and may not express the true conclusion to be derived from the whole evidence. If he has an opinion as to the guilt or innocence of the accused, it must affirmatively appear from the whole examination that he is impartial, or he cannot be received as a juror. We think upon the whole evidence of this juror it is manifest that the court had no sufficient evidence before it from which to be legally satisfied that the juror was impartial in the sense intended in the constitution. When the juror testifies that he has an opinion as to the guilt or innocence of the

accused, no matter from what source that opinion was derived, he cannot be accepted as a juror, unless from a consideration of the whole evidence, and the circumstances of the examination, including the conduct and demeanor of the juror, the court can find that he is impartial. Unless the court can find this as a matter of fact, it cannot be said the court is satisfied that the juror is impartial within the meaning of the statute. The testimony of several of the jurors was substantially the same as that of Mr. Johnson. They were received as jurors over the objection of the defendant, and in this we think the court erred.

4. Another question presented by the defendant is as to the sufficiency of the evidence to support the verdict. As before stated, the homicide was admitted, and it was sought to excuse it on the ground of necessary self-defense. There were several eye-witnesses to the transaction, and there are very few material discrepancies in their evidence. One of these witnesses to the transaction was examined in behalf of the state, and the others, as far as practicable, were called by the defendant. The deceased had been in the employ of the defendant for several months during the summer and early fall of 1904. Some difficulty had arisen between them in the settlement for these services. The defendant paid the deceased the amount that he admitted that he owed him and, as the defendant says, $10 in addition. The deceased insisted that he still owed him $30. He placed his claim against the defendant in the hands of an attorney for collection, but this claim seems to have been withdrawn without any action being taken thereon. The deceased was very vindictive against the defendant, and frequently made the most violent threats against him. There were several witnesses to these threats, some of whom testified that the deceased told them that the defendant had not paid him as much as he owed him, and that he would "take it out of his hide." Others testified that the deceased told them that he would kill the defendant unless he paid him the balance that he owed

him. On the evening before the tragedy the deceased came to the defendant's house at about 7 or 8 o'clock. He tied the mule which he rode at the gate, and left there a club which he had with him. This club was in evidence and was one of the exhibits, and appears to be a formidable weapon in the hands of an enraged man. The deceased then went to the house of the defendant and rapped at the door. Nobody answered him, and he walked into the room, where the defendant was, without further ceremony. The defendant took a lantern and went to his barn, as he says, to do some chores. The deceased walked along with him. While they were gone, it appears they had some controversy in regard to the difficulty existing between them, and when they came back as far as the gate an altercation arose, which was so violent as to attract the attention of the people in the house, who went to the door, and one of them went out where the altercation was. He testifies that the first thing he heard when he got there was that the defendant said to the deceased: "You brought this club here to kill me with, did you?" The deceased said: "I admit that I brought it here." The defendant then said: "Well, that is a pretty way for you to come to collect a bill. You brought that club on purpose to kill me with, did you?" The deceased said "Yes; I admit that I brought it and I intended to use it" and, calling the defendant a vile name, added: "You are too ornery to live. You ought to be killed." The witness says that the deceased kept calling the defendant names and "shaking his fist at him and threatening him." He was asked what Mr. Lucas said, and answered: "Mr. Lucas kept backing off, and told him to get out of the way. He did not want any trouble with him. He wanted him to get away, and let him alone. He didn't want to have any trouble with him." The witness testified further: "I heard Mr. Lester tell Mr. Lucas that he was going to come back the next morning. He said: 'I will come back prepared to fix you,' he said, 'or get my money.' He said: 'You * * * if I don't get my money, I will kill you.' He said: 'I will come back pre-

pared to do you up.' Mr. Lucas told him: 'You had better get on your mule and go on home and get off the place.' He said: 'I don't want you on the place any more.'" This evidence is not disputed by anyone, and is in harmony with the other evidence in the record. Soon after the deceased had left the defendant that night, the defendant went several miles to a telephone office to request the sheriff at Holdrege to come out there and protect him, but, not being able to talk directly with the sheriff, and being informed that the sheriff refused to come, he went several miles farther, where there was more direct line of telephone communication with Holdrege, but, as he testifies, he was unable to get the sheriff, it being so late and the offices being closed. He then bought a double-barrelled shotgun, and told the merchant from whom he bought it some of the circumstances that had taken place between himself and the deceased, and represented that he wanted the weapon to defend himself with. The party from whom he purchased this gun was a witness upon the trial, and testified that the defendant also said during their conversation, that if the deceased came into his yard, he would kill him. The cartridges which the defendant procured were charged with fine shot, which were removed by the defendant and replaced with buckshot. The next morning at about 7 o'clock, and soon after the defendant had finished his breakfast, the defendant saw from the window of his house the deceased and Mr. Kirschener coming, across the field toward the defendant's house. He took his gun, which was loaded with buckshot, and went out into his yard, and, when Mr. Kirschener saw that the deceased was walking directly toward the defendant he left the deceased and went in a somewhat different direction, toward the barn, where one of the other witnesses was at work. When the defendant saw this and that the deceased was coming directly toward him, he shouted to him: "Halt!" The deceased answered: "I won't do it," and paid no further attention.

Several witnesses were watching the transaction. None

of them testified that the deceased turned out of his course, which was directly toward the defendant, or that he hesitated in his advance toward the defendant. Some of them testified positively that he maintained his direct course toward the defendant, and hastened his speed when the defendant directed him to halt. There was a road or lane between the parties from 25 to 30 feet in width, upon which there had been some travel, and which led in one direction toward the Platte river, a few rods distant, where there was no bridge, and in the other direction toward what appears to be the main traveled road. When the defendant saw that the deceased was still approaching him, he called to him again, telling him to stop. "Don't come any closer," he said, "You take the road there and get away from here, I don't want any trouble with you. Keep away from me." The deceased answered, as before: "I won't do it," and kept on. The two fences were of about the same character, each being of two wires and not difficult to pass. The deceased passed through one of them. There appears to have been no impediment by the fence. One of the witnesses who was watching him testifies that he did not know whether he touched the wires at all, or just walked right through between them. Just as he had passed through the first fence, the defendant called to him the third time, telling him not to come on. The third time the deceased said: "I won't do it," and, just as he stepped into the traveled track, the defendant shot him, discharging both barrels of his gun, and killing him instantly. It must be said that the evidence clearly discloses that the conduct of the deceased from the first was such as to invite the tragedy which occurred. No rational man could have conducted himself as the deceased did, and consider himself safe in so doing. He was unarmed, but he had told the defendant the night before that he would be armed, and he purposely acted in such a way as to lead the defendant to believe that he was prepared to kill the defendant, as he said he would be. He probably had no intention of taking the life of the defendant. He would appear

to be a braggart, but he wanted the defendant to suppose that he intended to kill him, and he wanted that fact to be of assistance to him in carrying out his purpose. The question is whether the defendant did really suppose that the deceased intended to kill him, that is, whether the defendant himself acted in good faith in the matter, or whether he was pleased to see the deceased carry himself in such a manner as to give the defendant a special cause for taking his life, and whether, when he did take his life, he believed that the deceased was trying to impose upon him, and that there was no real danger. If a man of ordinary prudence and caution, situated as the defendant then was, and knowing what the defendant knew, would reasonably suppose that the deceased was armed, and was prepared and intended to then and there kill the defendant, and that, in order to prevent his doing so, it was necessary for the defendant to shoot the deceased, and if the defendant in good faith believed that his life was so in danger, and that he could only protect himself by shooting the deceased, then his action is justifiable on the ground of necessary self-defense. That the circumstances, as disclosed by this evidence, were such as to cause a man to reasonably believe that the deceased was armed, and that he intended then and there to kill the defendant and would do so, unless prevented, there can be no doubt.

It is contended by the state that the defendant did not, in good faith, believe himself to be in danger; that he had endeavored from time to time to aggravate the deceased, and to lead him on to such rashness as to afford the defendant an opportunity to take his life. The jury must have taken this view of the case. The question is whether the evidence establishes the view so taken beyond a reasonable doubt. The law does not allow a jury to reach such a conclusion from conjecture, or from considering that it may have been so. It was not incumbent upon the defendant to prove that he did not act from a malicious motive, that he did not desire to take the life of the deceased, but was compelled to do so. On the other hand,

in order to establish the guilt of the defendant, it was necessary that the state should prove, beyond a reasonable doubt, that the defendant did act from malicious motives, and that the defendant did not believe himself to be in such imminent danger as to make it necessary to take the life of the deceased in order to protect his own. These things, as before stated, must be found from the evidence in the case, and not from conjectures based upon possibilities, and the evidence must be of such a nature as to establish these elements of guilt beyond a reasonable doubt. The questions so presented are peculiarly within the province of the jury. If ordinary minds might differ as to whether the evidence establishes these elements of guilt beyond a reasonable doubt, the verdict of the jury cannot be disturbed. When the sheriff refused to go out to the defendant's place for his protection until the next morning, the defendant told him that it might be necessary then to bring the coroner; but this statement furnishes no evidence of an intention or desire on the part of the defendant to kill the deceased. The defendant had insisted to the sheriff that the deceased would kill him, and the expression used in regard to the coroner would as well apply to that view of the case as to any expectation that the deceased himself would be killed. Again, when the defendant purchased the gun with which the killing was done, he is said to have stated that, if the deceased on the following morning came into his yard, he would kill him. This statement furnishes the only evidence that we find in the record tending to show a disposition on the part of the defendant to unlawfully take the life of the deceased. If the defendant made this statement, which is by no means clear under the evidence, we do not see how it could be said to justify the conclusion, beyond any reasonable doubt, that the defendant did not at the time of the homicide in good faith believe that his life was in danger, and that the deceased was prepared and intended to carry out the threats which he had made upon the previous evening. We conclude that there is not sufficient evidence in the

record upon which to find the defendant guilty of murder in the first degree.

Several instructions to the jury are objected to, but the conclusion which we have reached renders their discussion unnecessary.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

HOLCOMB, C. J., took no part in the decision.