### RICHARDS v. UNITED STATES.†

(Circuit Court of Appeals, Eighth Circuit. December 3, 1909.)

#### Nos. 2,616–2,619.

**1. CONSPIRACY (§ 43*)—OFFENSE—SUFFICIENCY OF INDICTMENT.**

An indictment under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), for conspiracy to defraud the United States of public lands and to commit an offense against the United States by suborning entrymen to commit perjury in making oath to homestead affidavits, *held* sufficient.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79–99; Dec. Dig. § 43.*]

**2. CRIMINAL LAW (§§ 622, 1148*)—SEPARATE TRIAL OF CODEFENDANTS—DISCRETION OF COURT—REVIEW.**

The request of defendants charged in the same indictment for separate trials is addressed to the discretion of the court, and its action in refusing the same will not be reviewed, in the absence of clear indications that serious prejudice resulted therefrom to one or more of the defendants.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1380, 3050; Dec. Dig. §§ 622, 1148.*]

**3. CRIMINAL LAW (§ 1166½*)—APPEAL AND ERROR—REVIEW—PRESUMPTIONS—MATTERS NOT SHOWN BY RECORD.**

The overruling of a challenge to a juror for cause by defendants in a criminal case is not ground for reversal, even if erroneous, where the record shows that the juror did not serve, and does not disclose by whom he was excused, or that defendants exhausted their peremptory challenges.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3117; Dec. Dig. § 1166½.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied April 15, 1910.

**4.** JURY (§ 131*)—EXAMINATION OF JURORS—DISCRETION OF COURT.

On the examination of jurors in a prosecution for conspiracy to defraud the United States of public lands, it was within the discretion of the court to exclude a question by defendants asking the jurors whether they would consider it fraudulent for a man to loan a homestead applicant money to pay his fees and commissions, which involved a question of law upon which the jury was subsequently instructed by the court at defendant's request.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 561–582; Dec. Dig. § 131.*]

**5.** CONSPIRACY (§ 48*)—TRIAL—SUFFICIENCY OF EVIDENCE.

Evidence considered, in a prosecution for conspiracy to defraud the United States of public lands by means of fraudulent homestead entries and to commit an offense against the laws of the United States by suborning entrymen to commit perjury, and *held* sufficient to justify the submission of the case to the jury.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 110; Dec. Dig. § 48.*]

**6.** CRIMINAL LAW (§ 671*)—TRIAL—PRESENCE OF JURY DURING INQUIRY AS TO ADMISSIBILITY OF EVIDENCE.

Permitting the exhibition of a map to witnesses in the presence of the jury in a criminal case, in an attempt in good faith to lay a foundation for its introduction in evidence, was not error, although it was finally excluded, especially where it might properly have been received.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1591; Dec. Dig. § 671.*]

**7.** CRIMINAL LAW (§ 730*)—ARGUMENT OF COUNSEL—ACTION OF COURT.

A reference by the district attorney, on the argument in a criminal case, to a map which had been excluded when offered in evidence, was not prejudicial error, where the court promptly stated to the jury that the map was not in evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1693; Dec. Dig. § 730.*]

**8.** CRIMINAL LAW (§ 720*)—TRIAL—ARGUMENT OF COUNSEL—SCOPE.

Comments by the district attorney, in argument in a trial for conspiracy, on evidence properly admitted as tending to establish the conspiracy, *held* within the proper scope of argument.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1670, 1671; Dec. Dig. § 720.*]

**9.** CRIMINAL LAW (§ 390*)—TRIAL—EVIDENCE.

On the trial of defendants charged with conspiracy to defraud the United States by procuring fraudulent homestead entries of public lands, testimony of the entrymen that they did not intend to go upon the land and establish an actual residence was admissible.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 390.*]

**10.** WITNESSES (§ 388*)—IMPEACHMENT—LAYING FOUNDATION FOR PROOF OF INCONSISTENT STATEMENT.

Where it is sought to impeach the testimony of a witness by a prior affidavit made by him containing a number of questions and answers, it is the duty of counsel to call his attention to the particular part claimed to be inconsistent with his testimony.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1233; Dec. Dig. § 388.*]

_____

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**11.** CRIMINAL LAW (§ 338*)—TRIAL—RECEPTION OF EVIDENCE.

A wide latitude is allowed in the reception of circumstantial evidence in a criminal case.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 753; Dec. Dig. § 338.*]

**12.** CRIMINAL LAW (§ 1168*)—APPEAL AND ERROR—REVIEW—HARMLESS ERROR.

It was not prejudicial error in a criminal case to permit a witness to identify, with others, certain papers and records which were not thereafter introduced in evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3129; Dec. Dig. § 1168.*]

**13.** CRIMINAL LAW (§ 1059*)—APPEAL AND ERROR—EXCEPTIONS TO INSTRUCTIONS.

An exception to an instruction in a criminal case, to constitute the foundation for an assignment of error, should be so framed as to indicate definitely to the trial court just what is objected to, so that, if erroneous, it may at once be corrected.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2671; Dec. Dig. § 1059.*]

**14.** CRIMINAL LAW (§ 798*)—TRIAL—INSTRUCTIONS.

In a trial for conspiracy, where circumstantial evidence was relied on to prove the conspiracy, it was not error to refuse an instruction that, to warrant a conviction, each juror must be satisfied beyond a reasonable doubt of each fact necessary to be proved.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 798.*]

**15.** CONSPIRACY (§ 33*)—OFFENSE—CONSPIRACY TO PROCURE FRAUDULENT ENTRIES.

In a prosecution for conspiracy to procure fraudulent homestead entries of government land, if a conspiracy is shown, and persons were procured to make entries in pursuance thereof, who did not in fact intend to live on the land, it is not essential to conviction that it should be proved that defendants had actual knowledge of such intention.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. § 33.*]

Philips, District Judge, dissenting.

In Error to the District Court of the United States for the District of Nebraska.

Bartlett Richards, Will G. Comstock, Charles C. Jameson, and Aquilla Triplett were each convicted of conspiracy, and each brings error. Affirmed.

See, also, 149 Fed. 443.

R. S. Hall, John W. Lacey, and Charles J. Hughes, Jr., for plaintiffs in error.

S. R. Rush and Charles A. Goss, for the United States.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

HOOK, Circuit Judge. The plaintiffs in error were jointly indicted under section 5440 Rev. St., for conspiracy with various persons, some named in the indictment and others unknown to the grand jurors, to defraud the United States of the title, possession, and use of public lands in Cherry and Sheridan counties, Neb., by means of "false, feigned, fraudulent, untrue, illegal and fictitious entries" under home-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

stead laws and to commit an offense against the laws of the United States by suborning entrymen to commit perjury in making oath to homestead affidavits. They were tried and found guilty as charged in 35 out of 38 counts in the indictment. They were sentenced, Richards and Comstock each to pay a fine of $1,500 and to be imprisoned in a county jail for one year, and Jameson and Triplett each to pay a fine of $500 and to be likewise imprisoned for eight months. The punishment was within what might have been imposed upon conviction under any one of the counts. The assignments of error cover more than 400 pages of the printed record and those relied on more than 200 pages of the printed brief. We cannot do more than notice those which seem to merit attention.

The criticisms of the indictment are sufficiently answered by Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545; Cochran v. United States, 157 U. S. 287, 290, 15 Sup. Ct. 628, 39 L. Ed. 704; Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; Olson v. United States, 133 Fed. 849, 67 C. C. A. 21; Stearns v. United States, 152 Fed. 900, 82 C. C. A. 48; Ware v. United States, 154 Fed. 577, 84 C. C. A. 503; Thomas v. United States, 156 Fed. 897, 84 C. C. A. 477, 17 L. R. A. (N. S.) 720; Gantt v. United States, 108 Fed. 61, 47 C. C. A. 210. The complaint that the four defendants named were each denied separate trials is disposed of by United States v. Ball, 163 U. S. 662, 16 Sup. Ct. 1192, 41 L. Ed. 300; Krause v. United States, 147 Fed. 442, 78 C. C. A. 642.

It is also urged that the court should have sustained defendants' challenge for cause of proposed juror Seymour, because he said he had formed from reading newspapers an impression or opinion concerning such cases in general which it would take evidence to remove. Without considering the merits of this challenge, it may be said that Seymour was not a member of the jury which tried the case, and the record does not disclose when, how, or by whom he was excused. For aught that appears, the court may have afterwards excused him of its own motion, or it may have been done at the instance of the government. Even if it could be assumed that, after their challenge for cause was overruled, he was challenged peremptorily by defendants, the record does not show they exhausted their challenges of that character. So in any aspect the question of Seymour's competency as a juror is an academic one.

Upon the examination of jurors as to their qualifications, counsel for defendants asked a number of them this question:

"Would you consider it a fraudulent practice on the United States for a man to loan to a would-be homesteader the money to pay his fees, commissions, and expenses of his entry?"

The trial court sustained an objection thereto, and its action is assigned as error. In Connors v. United States, 158 U. S. 408, 15 Sup. Ct. 951, 39 L. Ed. 1033, the court said:

"It is quite true, as suggested by the accused, that he was entitled to be tried by an impartial jury; that is, by jurors who had no bias or prejudice that would prevent them from returning a verdict according to the law and the evidence. It is equally true that a suitable inquiry is permissible in order to

ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is a rule in civil cases, and the same rule must be applied in criminal cases."

The record before us shows that a wide latitude of inquiry was permitted, and no question was excluded that called for a statement of fact, or that properly tended to disclose the mental attitude of a juror towards the parties or the case to be tried. The question denied involved a rule of law concerning which, if not affecting their own transactions or their own relations to the government, men in general are not supposed to be accurately informed. It related to that which was within the province of the court in giving instructions. That this is so was recognized by defendants, for after the jury was impaneled and the evidence was in they asked the court to instruct regarding their right to advance money to entrymen, and the court did so. As said by the Supreme Court, the inquiry of proposed jurors is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. If questions like that set forth, and questions of mixed law and fact relating to the many and varied phases of a case, must be admitted—if their exclusion constitutes an abuse of discretion, and therefore error compelling a reversal—it is obvious that the examination of proposed jurors may be so conducted as greatly to obstruct and impede the administration of justice, without safeguarding any substantial right of an accused.

Complaint is made of the denial of defendants' request for a directed verdict. The evidence is so voluminous that it is impossible within appropriate space to do much more than refer to general features of the case made by the proofs. The great mass of corroborative detail and inferences the jury might properly draw must be omitted. It should be observed at the outset that the evidence in the case was alone that of the government. Defendants introduced none, nor sought, except by cross-examination, to explain many facts and circumstances that tended strongly to indicate guilt. The evidence showed that the Nebraska Land & Feeding Company, a Wyoming corporation, with an office at Ellsworth, Neb., ran its herds of cattle on what was generally known as the "Spade Range" in 1905 and previous years. This range, which was in Western Nebraska, was inclosed by the company with its own fences in connection with the fences of its neighbors, and included, unlawfully, many thousand acres of the public domain. There were also ranches known as the "Overton" and "C-Bar" which as some testimony tended to show were a part of the "Spade Range" and used by the Nebraska Company. Defendants Richards, Comstock, and Jameson acted on behalf of the company in various matters about to be related. They were about the office of the company, in Ellsworth, apparently with authority, and letters were written by them about the matters under investigation upon its letter heads, which recited that Richards was president, Comstock vice president, and Jameson secretary and treasurer. One letter Jameson signed as secretary.

On April 28, 1904, an act of Congress, commonly called the "Kinkaid Act" (33 Stat. 547, c. 1801 [U. S. Comp. St. Supp. 1909, p. 543]), was passed authorizing homestead entries in Western Nebraska in tracts of 640 acres. The act was to take effect June 28, 1904. The land in that country was generally of a character suitable for grazing, rather than for agricultural cultivation, and the prior limitation of homestead entries to 160 acres did not make it inviting. The object of the act was to encourage actual bona fide settlement by increasing the quantity of land that might be taken for a homestead. If this object had been realized, the result would have been the peopling of the country and the breaking up of the inclosures of the large cattle ranges. The defendants, including those jointly indicted, but tried separately, induced large numbers of men, mostly veterans of the Civil War, to make homestead entries on the range under the Kinkaid act. The entrymen came from Nebraska, Iowa, and Illinois, many of them from soldiers' homes in those states. Veterans were preferred, and were the greater in number, because their service in the army shortened the required period of residence on the lands entered as homesteads. The entrymen were attracted by promises of payment of all expenses, and by representations that their improvements would be made for them, and that they need not live on the lands selected, but, instead, a visit once in every six months was all that was necessary. There was also held out to them the promise of sale when final proofs were made. They came in small parties, sometimes a dozen or so, almost invariably in personal charge of some man in the service of defendants. Most of them were first taken to Gordon or Ellsworth, Neb., and thence driven to the range, where the drivers of the vehicles, who had been furnished by some one acting for defendants with the descriptions of the lands, pointed out to them the tracts selected for their entries. It is quite apparent, however, that in some instances slight attention was paid to pointing out the right tract to the right man. They then returned, their entry papers were prepared for them, sworn to, and they went to the land office under the personal supervision of one of the defendants or some one in their service. With very few exceptions their railroad fares, hotel bills, livery hire, fees for making oath to their papers, and their entry fees were paid, sometimes directly and at other times indirectly, by one of the defendants. Some never saw the land they entered; others were in doubt whether the land they saw was the land they entered.

The entrymen who testified as witnesses entered more than 30,000 acres of public lands. The majority of them said that when their entries were made they did not intend to live on the lands. All who testified on the subject but three or four so swore. The majority, being deceived by the representations made them, probably acted in good faith; but in fact they never intended to do those things requisite to actual settlement and residence on the lands embraced in their entries. Various persons acting for defendants, though independently of each other, made the same misrepresentations to the entrymen. Agreeably to what was told them, many of the entrymen came back about six months later to visit their lands, and their expenses were paid as before. Some never alighted from the vehicles in which they rode to

the range, some got off and ate lunch on their claims or in the vicinity, while others never got there at all. A less number went back a third time, six months after the second visit. This was the only settlement and residence made to comply with the law. All the improvements that were made were made at the cost of the Nebraska Company, or the defendants interested in it. There was so much of this, of such regular, unvarying kind, and the connection of defendants with it was so close, that the jury was justified not only in believing the defendants knew the entrymen never intended to live on their lands, but that it was a part of their plan to continue in that way their own prior use and occupation. In that way the lands were withdrawn from bona fide settlement, and the government was defrauded, irrespective of any subsequent acquisition by defendants or the company of the title if the entrymen succeeded in making final proof. As inducement some of the entrymen were told that upon final proof being made they could get $500 for their land, others $300 and still others $1 an acre. Some were informed that the defendants or the company were to have the use of the land until final proof in consideration of the money paid for expenses and entry fees. From others a lease was taken before entry was made, and the expenses and fees deducted from fixed rentals.

Shortly before the act took effect Richards arranged with a United States commissioner who lived about 30 miles away to go to Ellsworth on the 28th of June to act officially in swearing parties to applications and affidavits for homestead entries. They agreed upon the terms. The commissioner went there and on the forenoon of the day took the oaths of 16 or 18 applicants in the office of the Nebraska Company in the presence of Richards and Jameson. Jameson handed the papers to the officer and presented the applicants to him as they came up to be sworn. The fee of the commissioner was $1 per person sworn. At the end it was discovered the total paid him was short by a small sum. Richards paid the shortage. Richards supplied a number of the applicants with $1, and Jameson supplied the others.

Shortly before June 28th Richards met Fred J. Houghton, who is charged as a party to the conspiracy, at Crawford, Neb., and told him he wished to do some "colonizing," and to have Houghton work for him by the month in securing the location of homestead entries; but Houghton refused to work in that way. At a later meeting in Ellsworth it was agreed between them that he should receive $50 for each location, less the filing fee and expense connected with it. At Richards' request Houghton repeated in the presence of Comstock his understanding of the arrangement, and was corrected in one particular by Richards. He then went to work and procured eight men from Chadron, Neb., and vicinity, who were among those sworn by O'Keefe at Ellsworth on the day the act took effect. When Houghton was asked if he told them any one would assist them, he testified:

"Why, I don't think that I said to them that anybody would assist them. I told them—I don't know whether I used Mr. Richards' name, or whether I used the ranch name—but that they would put the improvements on the place for them, and if they made their proof and wanted to sell the land, that they would like the first opportunity to purchase their lands, and if they did so the money that would be paid for improvements would be applied on the pur-

chase price; otherwise, Mr. Richards thought he ought to have something for the use of his money."

As inducement to make entries Houghton gave two of them $25, three or four of them $10, and some of them $5. He rendered a statement of his disbursements, which was checked up by Comstock, and subsequently he was paid on the basis of $36 per man. The difference between this amount and the $50 agreed on equals the entry fee of $14 going to the register and receiver of the land office. The fair inference from the evidence is that some one on behalf of the company sent the papers to the land office and paid the entry fees. Four days before this occurrence at Ellsworth, Richards wrote Houghton as follows:

"Dear Sir: Enclosed I send you twelve descriptions. I am writing Mr. Scovel by this same mail to advance you $50.00 each on presentation of your receipts, etc. The United States commissioner will be here the morning of the 28th, and I see no reason why your parties, including Owens and all, cannot be here the night of the 27th with your papers made out, and we can have them in the hands of the receiver by noon. I have been trying to get you over the phone, but could not. Advise me of such other filings as you can by telegraph or telephone, or if you have unexpected some one who can come here at the last moment, send them down."

He afterwards wrote him eight letters about the accounts between them, the various entries and the entrymen. On July 28th he wrote relative to the entry of Morton, one of Houghton's entrymen:

"It was possibly the most important one which was filed by any one who came down here. By inquiry at the land office I find that Morton has 50 days from July 21st to pay the excess and complete his entry. Thinking possibly the best thing to do would be to simply let it run along, and not say anything to Morton, or give any intimation that anything was being done, I have had a filing filed on top of it. This was done last week. * * * His application adjoined a windmill, and is an important one upon our ranch. I gave him this filing, thinking that as brother of Claud Morton, who is a good steady boy, that he would be a good safe man, but I hear that quite the contrary is his reputation."

And on August 8th as follows:

"I understand that he is not a reputable man, or a man that can be trusted in the slightest degree; otherwise, by dint of hard work we might get the filing reinstated, if you would want to take the responsibility of his filing and the outcome. It may be best to let it be reinstated, if possible. I gave him the claim that he has because it was an important one."

Richards asked that this letter be returned to him. In another letter he expressed a doubt whether an entryman was one of Houghton's and said:

"My mother has recently made application for the same land. If it is friendly, she will apply for some other land."

In a postscript he added that A. Triplett had possibly sought the same information and that Triplett was inquiring in his (Richards') behalf. Aquilla Triplett is a defendant. Guy O. Vaughan was one of the eight entrymen who appeared before the commissioner and made oath at Ellsworth on June 28th. He testified Houghton solicited him to make the entry and promised him $25 if he would do so. Richards handed him and others each $1 to pay the commissioner's fee for

taking the oaths and also furnished the description of the land to be entered. Jameson repaid the expenses of other applicants than Houghton's who appeared at Ellsworth the same day, and furnished the description of the lands to be entered and the fees to be handed the commissioner. He said "they" would make the improvements, without indicating whom he meant. None of these entrymen know who paid the entry fees at the land office, or what became of the papers they signed and swore to. Defendant Triplett superintended the entries of 14 or more persons who lived in Alliance, Neb., most of whom he personally sought and solicited by representations that their expenses would be paid, their improvements made for them, and that they need do no more than visit their claims once in six months. With the exception of one man, who paid his own filing fee of $14, all who testified on the subject, and most of them did, said Triplett paid or gave them the money for the fees for taking oath to their papers and the filing fees. Some did not know who paid their railroad fare, buggy hire, and hotel bills. Those who did know said Triplett paid them. Triplett furnished the description of the lands entered. To one entryman he said the land was needed for pasture, and the improvements and expenses were given for the use of it until final proof. To another he said the cattle company would put all improvements on the land until final proof, and after that he (Triplett) would sell it to Richards and Comstock for $500. This entryman got two more for Triplett. When another observed on his second trip to his claim that the improvements had not beeen made, Triplett told him the carpenters had been so busy they couldn't get around to it, but would. To some he said he thought their land could be sold to the "Spade" for $500 or $1,000. He offered one man $5 each for entrymen he might obtain. One of the entrymen had a misunderstanding with Triplett about his expenses. He went to see Jameson, and the latter said the company was to pay all expenses, and on proving up was to pay $500 for the land.

It is necessary here to refer to the defendant Todd, who, with Huntington and Hoyt, also indicted, was tried separately. The evidence in the present case connects him with Richards, Comstock, and Jameson. In July and August, 1905, Richards wrote Todd four letters about various entries and entrymen. In one he said:

"We have concluded that it is hardly expedient at this time to have the men mentioned in your letter come up. On the contrary, please calculate to have all the ladies possible come up in October. They can act as each other's witnesses, I should judge. We will have everything in readiness to take them out there and show them the land and improvements."

From March to July, inclusive, Jameson wrote him ten letters upon the same subjects. In one he said:

"I note that you have quite a number whose declaratories expire the latter part of April. Let them come out at any time, but in as small lots as you can procure the cheap tickets for."

In another:

"I am sending you herewith check for $200, which I am simply charging to your account. Use it for purposes necessary, and then render me your bill, and your account will have due credit."

On May 1, 1905, he wrote:

"Enclosed I hand you check for $57.70; $19.70 of this amount is from (for) Mann's expense account, $27.50 is for the Ellsworth account, and $10.50 for the bill of Trueblood Bros. for livery. I would prefer that you remit for these different items yourself, so send you the amount. On April 8th I send you check for $200, which I charged to your account. Kindly render me a statement as to the disposition of this, so that I can give your account credit. * * * Relative to the six from Milford who filed the 14th, I will refer this to Mr. Comstock, and he will reply to you to-day or to-morrow."

Samuel Mann, referred to in this letter, lived in Quincy, Ill. He assisted Todd and worked under his direction. In 1903–1905 he procured about 50 "soldiers' declaratories," so called, and sent them to Todd. In 1904 he assisted Todd in getting up a party of 10 or 12 entrymen to go to Nebraska. When they arrived in Omaha the party divided. Some went to Ellsworth in charge of Todd, and the others to Gordon, Neb., with Mann. Todd had sent him the money for round-trip railroad tickets, and generally speaking their expenses were paid by Todd. Trueblood Bros., mentioned in the letter of Jameson to Todd, were liverymen at Gordon, Neb. They sent teams from 20 to 25 times to the Spade Range, conveying each time from four to seven old soldiers. With two exceptions the livery bills were paid by James Hull and defendants Huntington and Todd; on two occasions they were paid by the check of the Nebraska Company, signed by defendant Jameson. Twice the soldiers themselves paid. In some cases Huntington furnished the descriptions of the lands to be seen, and told the Truebloods where to drive them. On June 14, 1905, Jameson, as secretary, wrote Todd, inclosing a check to pay "railroad fare for party of five from Quincy to Gordon." Another letter inclosed a check for "amount expended for tickets, etc., and your own time and expenses." In this one he said he would take immediate action to appeal from the order of the receiver of the land office rejecting the proof in one case. On June 26, 1905, Jameson wrote Todd:

"I do not suppose there is any great hurry in sending the Milford men up here. I would a great deal sooner put it off for a while, and have you accompany them, than to have them come alone. There is no doubt but that they need a manager, or some one to look after them, and you are best adapted for that part of the show."

Todd had procured eight entrymen from a soldiers' home at Milford, near Lincoln, Neb., most of whom the evidence shows he solicited to go. Their railroad fare, livery and hotel bills, and filing fees were paid for them. The money for filing fees at the Valentine land office was pinned to the papers and handed by Todd to the entrymen, and by them in turn handed to the officials. The usual representations about the building of houses for them and the necessity of only visiting the locations once in six months were made to a number of them. As already observed, the Todd party from Quincy, Ill., divided at Omaha, Neb. Seven of them were conducted by Todd to Ellsworth, where he turned them over to Jameson, who furnished their filing papers, went with them to the land office at Alliance, and paid the entry fees. He told them they would not have to live on the land, would

have to go there but once in six months, and that the grazing would constitute the improving. Todd directed Mann, who took his division of the party to Gordon, to see the defendant Hoyt there. He did so, and Hoyt procured teams and a driver, who acted as guide to the lands. Several of the declaratory statements signed and sworn to by old soldiers in July, 1903, before Mann, and mailed by him to Todd at Plattsmouth, Neb., were afterwards without the knowledge of the signers altered in a material respect and filed in the land office, the filing fees being paid by some one not identified. Todd also went to Danville, Ill., and the soldiers' home in that vicinity, and employed an agent to secure declaratory statements from old soldiers.

In June, 1904, shortly before the 28th, defendant Hoyt arranged with a stenographer to go to Valentine, where one of the land offices was located. On the way the stenographer met Comstock and Huntington, and they got him an office in which he filled out papers for homestead entries. Comstock furnished the land descriptions and dictated them. The stenographer worked there about five days, and Comstock paid him for his services and expenses. At the direction of Comstock, McElroy, a carpenter, of Gordon, Neb., reported to a foreman on the Spade Range, who had him build two small houses 12 by 14 feet in size. He also assisted in building three or four more. Later Comstock contracted with him to build others at $65 each, everything to be furnished by McElroy but the hauling of the lumber. Accordingly he built 16 at places where he found lumber piled. Each was frame, 12 by 14 feet, with one door and a half window. He settled with Comstock. Comstock also arranged with him to bring a number of his friends to make homestead entries, to keep an itemized account of their expenses, and to send the bill to him, Comstock. McElroy said he got six or eight. They met Comstock and Huntington at Valentine, where the former furnished the descriptions of lands to be entered. The papers were prepared by the stenographer whom Comstock and Huntington located there. McElroy afterwards sent his bill for traveling expenses to the Nebraska Company and it was paid. One of these entrymen testified that they registered at the hotel in Valentine "on a separate sheet of paper," also that when their papers were prepared Huntington pinned a draft for $14 to them for filing fees. Todd got other entrymen at Plattsmouth, Neb., some of whom he personally accompanied. One went alone with a letter to Hoyt at Gordon, who saw that he had a team to visit the land and furnished him with money for filing fees and some expenses.

In June, 1904, Huntington engaged Irving D. Hull and James Hull to obtain as many declaratory statements of old soldiers as possible for use the day the Kinkaid act took effect, and also to get them to make homestead entries afterwards. The arrangement between Huntington and the Hulls was that when the soldiers came to make their entries leases should be taken from them. Huntington was to place the leases with the ranchmen at $100 each. Out of this sum the entryman's railroad fare, traveling expenses, and entry fees were to be paid, and the balance was to be divided, half to Huntington and half to the Hulls. Irving Hull was taken into the business, because he was a veteran of the Civil War and had influence with his comrades. The

ranchmen who were to get the leases were to pay the lease money, and when final proofs were made the lands were to be sold them for $600 per section, of which the respective entrymen were to receive $300, and Huntington and the Hulls the balance, less the expenses of subsequent visits of the entrymen to the lands. Huntington said he had seen Comstock a few days before, and had arranged to place all the filings. Under this arrangement the Hulls sent Huntington from various places in Iowa a large number of soldiers' declaratory statements, reciting that the latter had been authorized as their attorney to select the lands to be entered. They also conducted a number of parties of old soldiers from Iowa to Nebraska, some of whom were turned over to Huntington upon arrival. Twenty-one of the entrymen procured by the Hulls testified at the trial. The inducements held out to them and their experiences were similar to those in other cases. Not all testified upon the same subjects, but so far as they did there was a general concurrence. Upon arrival they were first driven in vehicles to what was pointed out as their land; upon returning they executed leases, some thought to Huntington, others thought to the company; then they went before an officer and took oath to their entry papers, then to the land office, under escort, where their entries were made. In some cases they were informed that $25 was the rental for six months, and they were given the balance of that sum, after deducting the railroad fare, travel expense, and entry fees paid on their account. The entrymen were not given copies of the leases, and their recollection of their contents was vague. Huntington told one party they were for the grazing of cattle at $50 per year, the lessee to make the improvements on the land. In one case defendant Hoyt gave an entryman a check for $114 for the entry fee of one of the party and six months' rental for four of them. Hoyt also obtained the signature of an entryman to a lease. Irving Hull told one that the leasing for pasturage meant settlement on the land, and nothing more was required; to another he said a cattle company would lease the land, and that would be the same as farming or improving it. Entryman Porter testified that on his second visit to the land in January, 1905, he was shown a different tract from that pointed out to him before he made his entry, and which he had marked. He said he had doubts whether he was observing the law, and asked Huntington if he was right, and the latter said he did not like to answer. Entryman Tobin concisely stated the representations made him by Irving Hull as follows:

"He said that I could enter a section of land out in Nebraska; that the cattle company there would lease that land of me by the year; that would pay my transportation out there to locate the land and enter it, pay all expenses, hotel, sleeping expenses, pay for the registering fee at the entrance office; that after I had entered the land they would make the improvements on it required by the government; and that after I had title to the land they would buy it. I think I asked him what they would give for it. I think his answer was not less than $300. That is all I can remember of the substance."

It was quite apparent to all concerned in these transactions that, considering the character of the land, many of the entrymen who 40 years or more before had served in the Civil War were incapable of

complying with the homestead laws. It was manifest, also, that what defendants did in the matter of these entries bore none of the aspects of philanthropy and none of the aspects of the ordinary loan of money, save as it was to be repaid by the continued use of the land and ultimately the title.

Complaint is made of the exhibition in the presence of the jury of what purported to be a map showing the exterior boundary fence of the Spade Range. It was made by an experienced surveyor, a Mr. Alt, who testified that he had lived for 10 years in one of the counties in which the range was located, had been over the range many times, was familiar with it, had been at roundups of cattle thereon, knew the exterior fence, its place of location on the earth, and in a general way the courses thereof by township and range numbers, had made a definite survey of it of which the map was the result, and that the map was correct. He also testified that as he was making the survey employés of the Nebraska Company were engaged in removing the fence. Other witnesses testified that portions of the fences shown on the map near where they lived belonged to the Nebraska Company, and that one of the defendants exercised dominion and control over it. The admissibility of the map was assailed, because the surveyor would not testify to the accuracy of the original government survey of the lands in that section of the country which he adopted in preparing his map, or that all sections were not in a square form, and because he did not put upon the map the interior fences, but only indicated the points at which they intersected the exterior surrounding fence. Though he said there were smaller inclosures within the big one, he testified they were a part of the Nebraska Company's range. With all the proof of its accuracy the map might very properly have been received as evidence of what it purported to be, but the court from an abundance of caution excluded it. It clearly appears that it was not exhibited to the jury in an objectionable way. There was simply a proper, consistent endeavor on the part of counsel for the government to establish a substantial foundation for its introduction in evidence. They pursued the ordinary, usual course by exhibiting it to witnesses to elicit testimony as to its verity. Krause v. United States, 147 Fed. 412, 78 C. C. A. 642.

During his argument the district attorney said to the jury: "It is an actual map, as Mr. Alt says, and a correct survey." Counsel for defendants objected to the remark about the map, and the trial judge said: "The map is not in evidence." The district attorney then said: "I am not exhibiting the map or quoting from it." Counsel for defendants excepted to the remark. The reference to the excluded instrument was one of those mere inadvertences, not unlikely to happen in a trial so long and with evidence so voluminous. The court promptly observed that the map was not in evidence, and made it clear to the jury they were not to consider it. No further admonition or more definite ruling was sought, and counsel contented themselves with excepting, not to the ruling, or the failure of the court to make it more explicit, but the original remark of the district attorney. If cases are to be reversed because of such occurrences, there would never be an end to trials.

On July 28, 1905, defendant Richards wrote Todd at Denver, Colo., saying they had concluded it was not expedient to have the men mentioned in Todd's previous letter come on, and further:

"On the contrary, please calculate to have all the ladies possible come up in October. They can act as each other's witnesses, I should judge. We will have everything in readiness to take them out there and show them the land and improvements," etc.

Defendants claim that counsel for the government was guilty of misconduct in referring to the letter and in his remarks about it. The letter was in evidence, and the passages referred to were not only relevant, but had a direct bearing on the charge of conspiracy, though no entry by any of the women was laid as an overt act. The letter showed a connection between Richards and Todd, and also the interest and active endeavor of the former in having entries made on the lands. Proof of the conspiracy was not to be confined to the specific overt acts charged in the indictment, but properly took a wide range. The remarks of counsel were within a proper scope of argument, which, as the term signifies, is not confined to a dry recapitulation of the evidence, but permits a reasonable latitude of comment and suggestion.

Various entrymen were allowed to testify over objection that at the time of their entries they did not intend to go upon the lands and establish actual residence, or live thereon, or make their homes there. We perceive no valid objection to such testimony. That the entrymen did not intend to comply with the law was one of the important facts in the case, and none could know better than they their actual intent. To affect the defendants, of course, notice or knowledge had to be brought home to them, but not necessarily by the particular questions referred to. Every bearing of a material fact in a case does not have to be embraced in every question asked to establish it. There was much evidence, direct and circumstantial, tending to show the knowledge of defendants of the real intent of the entrymen and their purpose to avail themselves of it, and it is therefore unnecessary to consider this phase of the case from the standpoint of undisclosed intent.

To impeach the testimony of these entrymen, counsel for defendants had them identify certain ex parte affidavits obtained from them after the indictments were returned, and then offered them as part of the cross-examination. Upon objection the court excluded them. The case of Entryman Child is selected as a fair example of all. The affidavit offered to impeach him contained nine separately numbered paragraphs. The only one that could have affected his testimony is as follows:

"7. Did you make your entry for your own exclusive use and benefit and in good faith? Yes."

The affidavit was offered as an entirety, and it was objected to by the government upon the ground, among others, that the attention of the witness had not been directed to particular parts of the instrument. Much of the affidavit was wholly irrelevant, and would have served only to incumber the record; and it was questionable whether

any part of it contradicted the testimony previously given. If it was claimed it did, it was the duty of counsel, not only to the court and the adverse party, but also to the witness himself, to indicate the part relied on for impeachment. The entryman was not a party to the litigation, and his statements were not admissible as independent evidence without preparatory foundation. It is a familiar rule, founded in a just conception of fairness to a witness, that his attention should be directed, not only to the time and circumstance of the prior declaration, but also to the particular declaration itself which is claimed to be contrary to that made upon the witness stand. Moreover, immediately after the exclusion of the affidavit, defendants' counsel in further cross-examination elicited from the witness an explanation of his testimony in chief and an express assertion of his good faith in making the entry, in that he understood the rule to be that if he was on the land once in six months and had it cultivated by grazing under lease, he complied with the law. It is to be further observed that the part of the affidavit which had any possible bearing on the testimony in chief was a mere repetition of what the witness swore to in his verified declaratory statement and his homestead affidavit, both of which had already been received in evidence. As to the excluded affidavits generally, it should also be said that the testimony they were offered to contradict related only to a small part of the counts under which defendants were convicted.

The evidence showed that John P. Creager and others residing in Iowa were induced by Irving D. Hull to go to Nebraska to make entries on lands in the Spade Range. After they arrived at Gordon, Neb., a livery team was obtained for them either by Hull or by Thomas M. Huntington, and they were driven about 20 miles to the vicinity of some windmills, where some lands were pointed out to them by the driver, acting under directions from Huntington. About six months later they again went from Iowa, and, having procured a team at Gordon, went to the same place, being driven, as Creager thought, by the same driver. Creager testified they could see five little buildings that had been put up. He was asked: "Was there any one of these buildings that was pointed out to you as being on your place?" Counsel objected that no connection with defendants had been shown. The objection was overruled, and the witness answered: "They said it was supposed to be our place." The answer was not responsive to the question; but no objection was made to it, nor motion to strike it out, and counsel for the government again asked: "Well, was there any one that pointed it out to you?" And the answer was: "Not in particular." It is now urged that the first answer was hearsay. Even if defendants were in a position to complain, the matter is trivial. There was a great mass of direct, undisputed evidence that defendants had many little buildings of that kind constructed for the entrymen on the Spade Range according to agreement, to relieve them from making improvements, and Creager had already testified that Hull told him they would erect one on the land he entered. But whether any one of these particular buildings was or was not within the lines of the particular tract Creager entered was unimportant. No one conversant with the testimony in this record, almost entirely undisputed, can fairly

regard the above matter as of any moment whatever; and this observation applies in large part to many of the assignments of error. It is only by extracting the occurrences complained of from their explanatory and qualifying surroundings that they assume such adventitious importance as to seem to merit attention. In Holmes v. Goldsmith, 147 U. S. 164, 13 Sup. Ct. 288, 37 L. Ed. 118, approved in Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278, the court said:

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and, therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances, the more correct their judgment is likely to be. The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth. The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are specially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

Before the examination of the entrymen the government put upon the witness stand L. C. Pettijohn, who had been the register of the land office at Valentine, Neb., for more than seven years prior to December, 1905, to identify various records in the office relating to the entries of lands. In the course of a long examination he identified the homestead applications, affidavits, and other records relating to entries made by David G. Weiford and Albert Noble, and they were marked by the reporter for future reference. It is urged that this was error, because the transactions were not charged in the indictment as overt acts, and because Weiford and Noble did not testify regarding them. It is sufficient to say of this that for some reason the two entrymen were not produced as witnesses and the records referred to were not offered or received in evidence. There was merely a preliminary identification of some public records, without even a description of the lands to which they related. It is impossible to see how this could have injuriously affected the defendants. That those entries were not charged in the indictment as overt acts did not prevent the government from making them admissible by establishing a connection between them and the defendants by other testimony, and it should not be presumed it was not the intention to do so when they were identified. Such occurrences are common in trials. If the matter had been regarded by counsel as of importance, and attention had been directed to it at the close of the evidence, the court would undoubtedly have stricken out the testimony. But as it was, it merely incumbered the record.

In its instructions the court charged the jury as follows:

"Witnesses have been called in the course of the trial who have testified to their own participation in fraudulent and criminal practices. Criticism has been made of their testimony, and the weight to which it is entitled. The court instructs you on this subject that it is the settled rule in this country that even accomplices in the commission of crime are competent witnesses, and that the

government has the right to use them as witnesses. It is the duty of the court to admit their testimony, and that of the jury to consider it. The testimony of accomplices is, however, always to be received with caution, and weighed and scrutinized with great care. But the jury should not rely upon it unsupported, unless it produces in their minds the most positive conviction of its truth. It is just and proper in such cases for the jury to seek for corroborating facts and circumstances in other material respects; but this is not absolutely essential, provided the testimony of such witnesses produces in the minds of the jury full and complete conviction of its truth."

Complaint is now made of the first sentence, but the exception taken when the charge was given embraced the entire paragraph. Without considering whether the court was right or wrong in the preliminary recital about the witnesses, it is manifest the paragraph contains a number of propositions which are indisputably the law. An exception should be so framed as to indicate definitely to the trial court just what is objected to, so, if erroneous, it may at once be corrected. This also applies to the complaint of the instruction on reasonable doubt. A single sentence is excerpted for the brief and argument from the long paragraph embraced in the exception, parts of which are clearly unobjectionable.

The court refused the tenth, eleventh, and twelfth requests of defendants which were as follows:

(10) "The jury are instructed that if any member of the jury, after having considered all the evidence in this case, and after having consulted with his fellow jurymen, entertains a reasonable doubt of any defendant's guilt, and after such consideration and consultation should entertain a reasonable doubt of any fact necessary to be proved to establish the guilt of that defendant, the jury cannot find such defendant 'guilty.' "

(11) "The jury are instructed that the conspiracy charged in this case cannot be inferred from mere circumstances of suspicion; but the jury must be satisfied beyond a reasonable doubt that there was an agreement existing between the defendants, or two of them, as charged in the indictment."

(12) "The jury are instructed that, unless they find that a conspiracy was entered into between the defendants or two or more of them, they must find the defendants 'not guilty'; that such conspiracy must not be guessed at, or found to be a fact from suspicions or suspicious circumstances, but that the jury, in order to find that there is such a conspiracy, must find that it is proved by the evidence beyond a reasonable doubt."

By the first of these requests a declaration was sought that, to find a defendant guilty, not only must each juror separately be convinced of his guilt beyond a reasonable doubt, but he must also be convinced beyond a reasonable doubt of the existence of each fact necessary to be proved. This goes farther than the authorities relied on. State v. Witt, 34 Kan. 488, 8 Pac. 769; State v. Rogers, 56 Kan. 370, 43 Pac. 256; State v. Logon, 73 Kan. 731, 85 Pac. 798; People v. Dole, 122 Cal. 486, 55 Pac. 581, 68 Am. St. Rep. 50; Castle v. State, 75 Ind. 146. We think the subdivision of the case and the essential elements of the offense into separate matter for the separate determination of each individual juror would have served to confuse, rather than assist in a just and lawful verdict. The unusual emphasis so given would have tended to destroy the interrelation between the important facts of the case and the probative value which comes from the concurrent existence of a number of them, each assisting in the proof of the other—in other words, the rationale of circumstantial evidence.

The eleventh and twelfth requests are defective, in that they assume the charge of conspiracy is confined to the defendants, while the indictment names others not made defendants, and says there are still others unknown to the grand jurors.

Defendants' twenty-third request, which was denied, is as follows:

"Notwithstanding you may believe that some of the entrymen may, at the time they made their entries, have had an intention not to live on the land embraced therein, the fact that they had no intention to live thereon is not material for your consideration in determining whether or not the defendants were acting fraudulently, unless you find that such intention not to live on the land was actually known to the defendants before or at the time such entry was made. It is not sufficient for you to surmise or suspect such knowledge on their part, but you must be satisfied from the evidence, beyond a reasonable doubt, that the defendants had such actual knowledge at the time such entries were made."

The request does not properly regard the nature of the offense charged. If the defendants and others conspired to defraud the United States of the possession and use of its lands by fraudulent entries, made with intent of the entrymen not to comply with the law, the act and procurement of one conspirator in furtherance thereof is imputable to the others, though they might be ignorant of a particular entry so induced and the fraudulent intent of the particular entryman. And if the conspiracy existed, and the details of its execution were intrusted to agents who procured such entries to be made, the illegal intent of the entrymen would be material for consideration, though actually unknown to the defendants. If the conspiracy contemplated false, fictitious, or fraudulent entries of the kind in question, a party to it is chargeable with the acts consummating it, though not personally cognizant with all the details. Indeed, he might be guilty, though no entries were made at all. Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; Dealy v. United States, 152 U. S. 539, 543, 14 Sup. Ct. 680, 38 L. Ed. 545.

The other contentions about the instructions need not be discussed. Some are disposed of by what has been said, and many of them by the opinion of this court in Ware v. United States, supra.

The judgment is affirmed.

PHILIPS, District Judge (dissenting). So deeply impressed am I with the sense that the defendants, especially some of them, were wrongfully convicted, that I cannot consent to an affirmance of the judgments. It may not avail to relieve them of the disgrace put upon them, but it is due to them, and to myself in differing from my Associates of equal sincerity, that I should state the grounds of dissent, as briefly as the multitude of facts and questions of law involved will permit.

The glory of the criminal law and the aspiration of its ministers should be to accord to the accused, as far as possible, a fair and impartial trial. He should have his cause tried to a jury of his peers, free from undue bias and prejudice. I recognize the rule or discretion exercisable by the trial judge in the matter of questions to jurors on voir dire examination, not to be interfered with, unless it be apparent that such discretion has been abused in the particular instance.

But as said by that great jurist, Judge Christiancy, in Hill v. People, 16 Mich. 351–357:

"The people in their sovereign political capacity assume to provide by law the proper tribunals and modes of trial for offenses, without consulting the wishes of the defendant: and upon them, therefore, devolves the responsibility of not only enacting such laws, but of carrying them into effect by furnishing the tribunals, the panels of jurors, and other safeguards for his trial, in accordance with the Constitution, which commands that he be tried by an impartial jury. The government, the officers of the law, bring the jurors into the box. He has no control over the matter, who shall be summoned or compose the panel upon which he may exercise his right of challenge."

Therefore it follows that if the court by narrow or arbitrary ruling limit counsel in the matter of inquiry of the juror to ascertain who and what he is, his mental inclination, or condition of mind toward the character of offense with which the defendant is charged, to enable him the more intelligently to exercise his right of challenge, the whole advantage is with the prosecution. The inclination of the mind of the trial court toward the defendants in this respect was first manifested in the examination of jurors respecting their qualification. One example is sufficient. The juror on examination stated that he had heard of the case, had read about it in the newspapers, and finally admitted that he had received impressions therefrom against the defendants which it would require evidence to remove. The court interposed and inquired of the juror if, notwithstanding the opinion, he could give the cause a fair and impartial trial, and decide the case from the evidence in court. He answered that he thought he could. On cross-examination the juror said that he would have to have some evidence to remove the impressions he had; and when further asked, as the matter thus stood, if the evidence were about equal, whether his opinion would incline him in the way of the view he then held, his answer was: "Yes, if I considered it just equal; otherwise, it wouldn't." It should require no citation of authorities to show that such a minded juror was subject to challenge for cause; but the court ruled otherwise. Under the statutes of Nebraska respecting the qualifications of jurors, as repeatedly construed by the Supreme Court of that state, such a juror was clearly disqualified. Miller v. State, 29 Neb. 437, 45 N. W. 451; Owens v. State, 32 Neb. 167, 49 N. W. 226; Rutherford v. State, 32 Neb. 716, 49 N. W. 701; Cowan v. State, 22 Neb. 523, 35 N. W. 405; Thurman v. State, 27 Neb. 630, 43 N. W. 404; Basye v. State, 45 Neb. 272, 63 N. W. 811; Lucas v. State, 75 Neb. 11, 105 N. W. 976.

The trial court was willing for such a juror to serve in the trial of these defendants. This action of the court is held not to constitute reversible error, for the reason that counsel for the defendants did not disclose in the bill of exceptions that they exhausted their peremptory challenges on this juror, and the record does not disclose that he served on the jury. If the same character of inference should be indulged in favor of the defendants as is made in many instances in the record against them, there could be little question in the impartial mind that as matter of fact the defendants did exhaust a peremptory challenge on said juror. There were, however, exceptions duly saved to other incidents of the examination of jurors demanding review.

175 F.—59

Counsel for the government, in the examination of Juror O. M. Hall, who was afterwards sworn as a juror in the case, asked the following question:

"Q. Have you any objection to the enforcement of the law of the United States relative to fraudulent practice in acquiring land? A. I have not; no, sir."

. Then on cross-examination the question was asked him:

"Q. Would you consider it a fraudulent practice on the United States for a man to loan a would-be homesteader the money to pay his fees, commission, and expenses of making entry?"

This was excluded by the court. The like question was propounded to other jurors, who served on the trial, and excluded by the court. If it was competent, as it was, for counsel for the government to inquire if the juror had any objection to enforcing the law against fraudulent practices respecting homestead entries, it is difficult to perceive why, for the purpose of enabling defendants' counsel to make peremptory challenges, the defendants should not have been permitted to follow up the line of inquiry by asking the question excluded. The trial court responded by its ruling favorably to the reason assigned by counsel for the government, that the question in effect submitted to the jury a matter of law, and that view, among others, is approved by the majority opinion. I respectfully submit that the phrase, "Would you consider it a fraudulent practice on the United States," implies no criminal consequence. Clearly enough it was intended to learn the mind of the juror, as to how he viewed the mere act of furnishing money to men entitled to make homestead entries, with which to pay the fees and expenses of his entry. If the inclination of his mind were to regard such acts with disfavor, as tending to fraud, while that might not disqualify the juror it was an indication of the bent of his mind—his feeling respecting such act, which the defendants might have to overcome. It was certainly so related to the very matters to be tried as would afford some safeguard in making challenges. It by no means, in my opinion, meets the right of the defendant in a criminal prosecution to be reasonably advised, so as to exercise intelligently his right of challenge, to say that the court in its charge might tell the jury that such and such act was not criminal, as it should be presumed the juror would heed the court. This very suggestion is a concession that the state of mind inquired about was neither collateral nor irrelevant, but was of substance, coming, as the record shows, within the due consideration of the case on trial. If the juror had preconceived notions that such practice tended to fraud, according to his moral sense, if advised thereof, counsel for the government would certainly the more willingly accept such a juror as more likely to find a verdict of guilty on the broader inclusive issue as to whether other things done by the defendants respecting the entries were in good faith. For a like reason the defendants would be prudent in not accepting such juror.

The case of Connors v. United States, 158 U. S. 408, 15 Sup. Ct. 951, 39 L. Ed. 1033, cited in the majority opinion, is quite different from the situation here presented. Connors was indicted for violating the federal statute then in force, prohibiting interference with judges

of election in performing their duties. The inquiries put to the juror were political in character, as to whether or not he was active in politics at elections, or a partisan, whether that prejudiced him, and whether or not he was a member of a committee known as the "Committee of One Hundred." It is apparent, on careful reading of the opinion of Mr. Justice Harlan, that he thought it unadvisable, as matter of public policy, to inject partisan politics into the case, for the reason that:

"The law assumes that every citizen is equally interested in the enforcement of the statute to guard the integrity of national elections, and that public opinion or affiliations will not stand in the way of an honest discharge of his duty."

So, also:

"Active participation in politics cannot be said, as matter of law, to imply either unwillingness to enforce the statutes designed to insure honest elections and due returns of the votes cast, or inability to do justice to those charged with violating provisions of those statutes. Strong political convictions are by no means inconsistent with a desire to protect the freedom and purity of elections."

Further on, the opinion adverted to the fact that there was no extraneous evidence showing any special reason for putting the particular question to the juror, and there was nothing in the record to show that there was any such committee as the "One Hundred of the City of Denver," or any connection between the committee and the prosecution. But in the case at bar the question put by the government's counsel to the juror in the first instance indicated that there was some connection between the alleged fraudulent practice of the government respecting homestead entries and the case at bar. The records of this court, and the current newspaper literature of the day, showed that similar prosecutions had been conducted in the federal court of Nebraska; and there was consequently a wide-spread feeling respecting the very character of offense with which these defendants were charged. How the mind of jurors might be affected towards persons furnishing money for such purpose, when it was accompanied with the charge that it was not done in good faith, was pertinent to the ultimate question to be tried, and, therefore, the predilection of the juror was proper information to aid the defendants in striking the jurors.

Courts of the highest character have given expression to the rule of law in this respect as follows:

"To give to both state and defendants considerable latitude in the examination of persons called to act as jurors, not only to facilitate the discovery of grounds for challenge for cause, but to enable the parties interested to discover any peculiarity of conduct, association, character, or opinion, or any predilection, of the person under examination, or other circumstances which, in the opinion of the examiner, might influence the person as a juror, and affect his verdict. It is well known to persons familiar with jury trials that jurors are frequently influenced in reaching a verdict by considerations which have no legitimate application in the case. The right of peremptory challenge gives the means of keeping from the jury persons of that kind, which the challenge for cause does not afford, and parties should be permitted to examine persons called to act as jurors, within reasonable limits, to the end that the peremptory challenges may be used intelligently. It was the privilege of the state to ex-

clude from the jury, so far as its right to peremptory challenges extended, all persons who are prejudiced against the infliction of the death penalty; and it was not an abuse of the right of examination to permit inquiry as to the views of the persons summoned as jurors, on that point." "The office of the peremptory challenge is to protect the defendant against those legally competent, but morally or otherwise unfit or unreliable, to try the particular case, and to deny a full and fair examination of a juror in order to wisely exercise the peremptory challenge would be practically to nullify the right; for of what avail would a peremptory challenge be, if exercised at random, or blindly and without reason? The right to peremptory challenge is the last precious safeguard of a fair trial left to the one charged," etc. "The defendant should be permitted great latitude in examining jurors, so as to be in position intelligently to exercise his challenges, and whenever there is a fair doubt as to the propriety of a question it is better to allow it." State v. Dooley, 89 Iowa, 584, 57 N. W. 414; Hale v. State, 72 Miss. 140, 16 South. 387; State v. Tighe, 27 Mont. 327, 71 Pac. 3; State v. Godfrey, Brayton (Vt.) 170; People v. Car Soy, 57 Cal. 102, 103; State v. Bresland, 59 Minn. 281, 61 N. W. 450; Towl v. Bradley, 108 Mich. 409, 66 N. W. 347; State v. King, 174 Mo. 655, 658, 74 S. W. 627; State v. Mann, 83 Mo. 595, 599.

Coming to the broader merits of the case, the indictment was assailed on demurrer for insufficiency, especially for uncertainty in employing the term "entry" as the means by which the government was to be defrauded of the title to the lands under the homestead acts. The contention was that the term "entry," so employed, is a variable quantity. In Hastings, etc., R. R. Co. v. Whitney, 132 U. S. 363, 10 Sup. Ct. 114 (33 L. Ed. 363), the court said:

"Under the homestead law three things are needed to be done in order to constitute an entry on public lands: First, the applicant must make an affidavit setting forth the facts which entitle him to make such an entry; second, he must make a formal application; and, third, he must make payment of the money required. When these three requisites are complied with, and the certificate of entry is executed and delivered to him, the entry is made—the land is entered."

So here it was contended that the term "entry" might be referable to the preliminary act above designated, on which no conviction could be had, for the palpable reason that the thing done would be quite ineffective to obtain the title to the land. Dealy v. United States, 152 U. S., loc. cit. 545, 14 Sup. Ct. 680, 38 L. Ed. 545. In the Dealy Case the court held that notwithstanding the term had its technical use, which might mean "a mere preliminary application," it also had its popular use, implying that the proceeding as a whole constituted "the complete transfer of the title." And because of the allegations of the indictment there indicating that the term was employed in its more popular sense, evidencing a purpose to obtain "a complete transfer of title," the indictment was held to be good. So here, as it is claimed, the indictment clearly enough indicating that the scheme of the conspiracy was to obtain the title to the land, the demurrer was rightly overruled. Therefore, to sustain the indictment, the proof must respond to the allegation, showing, beyond a reasonable doubt, that the ultimate purpose of the alleged conspiracy was to obtain title to the land, to the use of the defendants or the Nebraska Land & Feeding Company.

A careful reading of the vast volume of testimony in this record has satisfied my mind that, indulging the largest latitude to the jury in

drawing inferences and conclusions, the very utmost the evidence warrants was a finding that it was the mind of some of the defendants, by bringing about the homestead entries in question, to obtain leases from the homesteaders, with a preferential right to buy the lands from them after patents were obtained, should the entrymen conclude to sell. The evidence shows quite clearly that the defendants, who are claimed to have been the real exponents of the alleged conspiracy, understood what the courts of authority had held to be permissible—that they had a right to loan or advance to persons eligible to make homestead entries money therefor; that they could make valid contracts with the settlers for leasing the lands, as a means of refunding such advancements; and that they violated no law in the request that if, after acquiring patents, the entrymen concluded to sell, they would give the parties who thus aided them preference as purchasers.

That it was desirable to the Nebraska Land & Feeding Company to protect for the time the ranges contiguous to its ranch for its use, by having near not unfriendly neighbors, and to obtain leases from them, and that it was desirable to obtain the land by purchase if the homesteaders concluded to sell after acquiring title, may be conceded. It is evident, however, from the whole trend of the trial, as it is from expressions in the majority opinion, that if what some of the defendants contemplated was to obtain the use and occupancy of the lands for grazing purposes, and the preliminary entries had the effect to withdraw for the time being the lands from entry by bona fide homesteaders, the government was defrauded, and the conviction should be sustained. This unfolds the radical vice in the conviction of these defendants. As already stated, the demurrer to the indictment should have been sustained, but for the conclusion that the term "entry" was employed in the indictment in the popular sense of such entry as would effect "the complete transfer of title," as in the Dealy Case. If the purpose had been by preliminary entries to continue the mere occupancy of the land by the cattle company during the period prior to the issuance of patents thereon, whereby other homestead beneficiaries would have been deferred, it might have been a fraud on the government, as was held in Stearns v. United States, 152 Fed. 900, 82 C. C. A. 48; but the indictment in such case would have had to show that the term "entry" was used in such limited technical sense.

There was no written agreement in evidence between any of the defendants and any of the entrymen to convey the lands in question to the cattle company, or any one else. There was no evidence in pais to the effect that on furnishing the entrance money, the expenses of the entrymen, or any bonus to be paid by the defendants, the entrymen were after final proof or patent to relinquish the title to the defendants, or either of them. The existence of such understanding was left in the wide field of mere conjecture and speculation—inferences to be drawn by the unrestrained and unguided notions of the jury, by impressing them with the belief that in the matter of preliminary entry and occupancy some of the entrymen had no bona fide purpose to occupy and acquire the land as a personal homestead.

This leads to a consideration of what observation profoundly impresses me with the conviction is a gross and dangerous abuse in re-

cent practice of prosecutions under section 5440, known as the "Conspiracy Statute." It having been held in Clune v. United States, 159 U. S. 590, 16 Sup. Ct. 125, 40 L. Ed. 269, that notwithstanding the act be forbidden by a special statute, prescribing a lesser punishment for its violation, such as a fine without imprisonment, the same violation of law, if compassed by two or more persons combining therefor, under section 5440 would subject the offender to severer punishment, as for a felony, it has become almost the habit of the government prosecutors to invoke this conspiracy statute under every colorable pretense, especially in respect to a class of offenses which the Department of Justice have been zealously prosecuting. By combining a large number of suspected offenders in one indictment under a charge of conspiracy, with the wide range such an inquiry may take, the character of evidence which may be admitted peculiar to such investigation, the prejudice roused in the mind of jurors against some individual defendant being unwittingly carried over and imputed to another defendant against whom, separately considered, there may be no positive evidence of guilt, it is made more than possible to convict an innocent man, unless the courts stand unflinchingly as the sword of justice between him and his pursuers.

There were over 30 counts in this indictment predicated of as many different homestead entries, each entry presenting its own peculiar facts; other counts charged subornation of perjury connected with other entries; and still another count charged forgery in a certain power of attorney pertaining to a homestead entry. All these different issues were tried, in solido, against these defendants to the same jury, in a trial extending over a month, in which a multitude of witnesses was examined. With the confusion incident to such a mass of testimony, some more or less inculpatory of some of the defendants, the court letting every incident of dealings between some of the defendants and some particular entrymen, and conversations with persons not present or named in the indictment, go to the jury, on the suggestion that from the entire mass the jury, as judges of the ultimate facts, might determine the existence of the alleged conspiracy among all the defendants, it is made manifest how through lack of intelligent discrimination, and a charge dealing in generalities without specifically directing the attention of the jury to the special facts respecting the particular entry or defendant, the jury found all the defendants guilty on every count submitted to them; and but for the fact that the court of its own motion took from their consideration a few counts there is no reasonable doubt that the jury would have returned a verdict of guilty on all of them. The defendants were regarded by court and jury as a mere mass, not dissoluble.

Take, for instance, the first count of the indictment, predicated of the entry made by Clyde R. Beckwith. The charge is that he was induced by the defendants to make an entry of 640 acres under the Kinkaid homestead act, for the purpose of acquiring the title for the use and benefit of the defendants and the Nebraska Land & Feeding Company; that prior to the making of his filing affidavit he had entered into a contract or agreement with the defendants, to the effect that the title which he might acquire from the government and the use

and benefits of said lands should inure to the benefit of the defendants and said land company. I have read carefully the entire testimony of the witness Beckwith, introduced by the government. The very most that can be predicated of it is that the filing fees were probably advanced by the defendant Comstock; and it may be further conceded that his expenses were paid by some one, whom the defendant could not state. When inquired of as to whether anything was said about a note, he said that other parties were signing notes for expense money, and he signed one. This witness was more or less familiar with the location and character of this land, as he already had a homestead entry thereat; and when it was proposed to select the land for him he gave direction to have it placed near his other land. He said: "I think it joins on the south." He further testified that Comstock owed him for hay on his homestead. While he made no improvements on the land, he held his homestead adjoining it, which he had proved up before the passage of the Kinkaid act. There is not a word of testimony to warrant the remotest inference that this man agreed to make this entry in the interest of the defendants, or either of them, or that he even had any understanding with them that at any time he was to lease the land or convey it to them.

It was shown that one McElroy was approached by the defendant Comstock, and asked if he did not wish to make entries of land, and he said he did; and it may be conceded, for the purpose of this consideration, that McElroy undertook to induce other parties to make such entries, and that he took them to the land office at the instance of Comstock. When inquired of as to what Comstock said while the witness and other parties, including Beckwith, were in the room where the affidavits were being made, his answer was: "Comstock said: 'You are not taking this land for me. It is for your own use, to do what you please with it.'" This witness said that he did not take his family upon the land because there were no facilities there for his children to go to school, but that he had been upon and made improvements upon the land; that he took there bedding, stoves, and dishes, and his understanding of the law and practice was that he was not required to take his family on the place to live; and that he lived up to the requirements of the homestead laws as he understood them. The following question was asked him: "In all or any of the conversations that you had with Mr. Comstock, or any other of the defendants, if you had any, was there any talk—was there any agreement or understanding in any way, shape, or form, that these entries of yours, or anything else, were to inure to the benefit of Mr. Comstock, or to be taken for him or any of the defendants?" He answered, "No." He gave Comstock a note for the money advanced for him.

By the introduction of McElroy as a witness on behalf of the government, it vouched for his integrity and credibility. There was no contradiction of the testimony of Beckwith, or of McElroy, who was claimed to be acting on behalf of Comstock. And yet the defendants were found guilty under this count of having as conspirators entered into an agreement with Beckwith whereby they were to obtain for themselves and the cattle company the title to this land. The only explanation of this extraordinary result is the confusion into which

the minds of the jury were brought by such a multiplicity of counts, and the impressions made upon their minds by a mass of testimony respecting other entries and statements of parties wholly disconnected from the Beckwith entry. The court should have directed a verdict of not guilty on this count.

The fourth and thirty-third counts of the indictment charge one Fred J. Houghton as a conspirator with the defendants to obtain the title to certain lands by homestead entries. The only witness offered by the government to prove Houghton's connection with the alleged conspiracy was Houghton himself, and then followed that up by putting in evidence all the conversations he had with certain entrymen. The whole substance of his testimony is that he had been, or was, engaged in procuring or assisting homesteaders in making locations; that some time prior to the date of the alleged formation of the conspiracy, he met the defendant Richards, who said that he wished to do a little colonizing, or some such word, and asked him if he might not locate some homesteads in the neighborhood of his ranch. The witness answered that, on account of the condition of his family, he did not want to be from home. At a later conversation Richards said to him that he wanted him to make some homestead locations in that part of the country, and if he would locate people there he would willingly pay him so much for each location. Afterwards he saw Comstock in the presence of Richards, when the latter said to him, in order that there might be no misunderstanding, he wanted the witness to repeat the understanding between them in the presence of Comstock.

"I told him my understanding was that I was to receive $50 for each location, and Mr. Richards said, 'No, that wasn't it; that was to cover filing fee and all,' and I think that was all the conversation that was had there in the presence of or with Mr. Comstock."

Afterwards the witness procured eight men to make homestead applications. A part of the men came to him and solicited an opportunity to go down there and file themselves. He told them that if they wanted to make homestead entries, perhaps, he could place them where they could get a piece of land that would be of benefit to them some time; if they were not able to make the trip and improvements, they might perhaps have assistance to do it.

"I don't think I said to them that anybody would assist them. I don't know whether I used Mr. Richards' name, or whether I used the ranch name, but that they would put the improvements on the place for them, and if they made their proof, and wanted to sell the land, that they wanted the first opportunity to purchase their land, and, if they did so, the money to be paid for improvements would be applied on the purchase price; otherwise, Mr. Richards thought he ought to have something for the use of his money. * * * He said that I could tell any people that I located there that he would put the improvements upon the land for them, and that in the event of their proving up, if they wanted to sell, he would like to have the first opportunity to buy, and would buy at a reasonable figure, if they agreed to sell. He also said further that he would be glad to have any one come over there and enter, or make a homestead for their own use and benefit."

This is the substance of his whole testimony touching the relations between defendants and himself, and, of course, it was the only understanding between the entrymen and Richards. I submit that such an

arrangement is not forbidden by law. On the contrary, it has been specially ruled that the right to loan and borrow money upon the security of the land, or mortgage the same, and to even agree to lease it before the issue of the patent and final certificate, is permissible under the homestead pre-emption law. Hartman v. Butterfield Lumber Co., 199 U. S. 336, 26 Sup. Ct. 63, 50 L. Ed. 217; Ware v. U. S., 154 Fed. 583, 81 C. C. A. 503; Lewis v. Shaw (C. C.) 70 Fed. 294; Hafemann v. Gross, 199 U. S. 342, 26 Sup. Ct. 80, 50 L. Ed. 220.

Of all the entrymen obtained by Houghton, Vaughn alone is the only one who testified that he did not make entry for the honest purpose of acquiring a homestead. All the other entrymen are not complained of. The witness Melcher, introduced by the government, testified that he took the land in good faith and intended to live on it. The fact that Beckwith afterwards stated that he did not intend to live on the land by no rule of law or principle of common right could affect the defendants, unless the evidence went further and showed that the defendants were aware of his purpose not to comply with the law when he made the entry, and there is no such evidence.

It does seem to me that the request made, as shown by the seventeenth assignment of error (Record, page 3052), in respect to the Houghton transaction, should have been given:

"The defendants, or any of them, had a perfect right to advance money to entrymen to pay filing fees, and to agree that, in the event the entryman desired to sell after he had proved up and the defendant then desired to buy, such advances should be credited on the sale, or, if no such arrangement was thereafter made, the money would be refunded, and that such an agreement would not, in and by itself, be a violation of any law of the United States."

This the court refused, without adding the words:

"But such fact may be considered in connection with the other evidence in determining the existence of the alleged conspiracy agreement."

Thus it is made manifest how it was that the jury could return a verdict of guilty on all of the counts of the indictment, including those respecting the Beckwith and Houghton transactions, by coupling those incidents up with other unrelated transactions. In the arrangement Houghton was authorized by Richards to make with the entrymen there was not an element of fraud in it. If so, it could not by any principle of known law be made criminally wrong, simply by considering that arrangement "in connection with the other evidence in determining the existence of the alleged conspiracy or corrupt agreement."

Suppose the counts predicated of the interests procured through Houghton had stood alone in the indictment; would not the defendants upon Houghton's testimony have been entitled to a peremptory instruction to return a verdict of not guilty? Should this right be denied them on the suggestion of the government's counsel that transactions with other entrymen were not in good faith, whereby they intended to obtain title to their lands? In other words, if the Houghton transactions in and of themselves were lawful and honest, they could not have been a part of a fraudulent scheme to defraud the government.

The fifth count of the indictment is another like illustration. It is predicated of an entry made by George W. Guilford, who was introduced as a witness by the government. He resided at Dunlap, Iowa, and made his filing upon the land after a conversation with one James Hull. Railroad tickets were provided by Hull, and a number of men went with him to Nebraska, and were taken out to see the lands. This man Hull was acting for and in the interest of one Thomas A. Huntington, who is charged as a codefendant in the conspiracy, but tried in a different group. Huntington was in no wise connected with the ranch of the Nebraska Land & Feeding Company. The ranch in which he was interested was 20 miles away. The expenses of the trip made by Guilford were doubtless paid by Huntington. The entryman made a lease of the land to Huntington, under the agreement that the expenses so advanced were to be taken out of the lease money. The whole conversation detailed by this witness was with Huntington alone, and was to the effect that Huntington said he was not buying or investing anything in lands. At the end of six months the witness returned, his expenses being paid as before. He testified that he did not intend to make an actual settlement—that is, to move his family on the land; that his understanding was that if he visited the claim once in six months, occupied it with cattle, built a shanty on it, and made some improvements and so on, such would be all that he was required to do.

"Q. Who gave you that information? A. Well, sir, I don't know how I got that hardly. I got it from several different parties."

He further testified that he entered the land for the purpose of getting a homestead, the same as other people did, for his own benefit. If there was anything in it, he wanted to get it out of it. Having put Guilford on the stand, the government was certainly bound by his testimony that he was acting in good faith. There is not a particle of evidence that this witness either acted or filed on the land for the benefit of the defendants or the Nebraska Land & Feeding Company. His entry was not within 20 miles of the Spade Ranch, for which the defendants here are claimed to have been acting. The defendants did nothing to interfere with or prevent the good intentions of. this entryman. It is impossible under his evidence to perceive how his entry could inure to the benefit of the defendants, to enable them to obtain the title to the lands; yet the jury returned a verdict of guilty on this count.

### Statement of the Hulls.

As already stated, Thomas Huntington was interested in the ranch known as the "Huntington Pasture," 20 miles from the Spade Ranch. He had no interest in or connection with the Spade Ranch, nor had the defendants any interest in or connection with the Huntington Pasture. The evidence tends to show that, prior to the time laid in the indictment for the formation of the conspiracy in question, Huntington had been engaged in obtaining and selling lease contracts on homestead entries. About the time of the passage of the Kinkaid act he met with one James Hull, who had been engaged to some extent in

securing homestead entries for soldiers, and arranged with him that, if he secured soldiers entitled to make entries under said act, he would sell leases thereon at $100, to be divided between them. The government used said Hull, and his brother Irvine who stood in with him in said arrangement, as witnesses, who testified, over the objections of the defendants, to conversations had with Huntington, and what they said to intended entrymen obtained by them. The admission of this apparent hearsay testimony assumed, first, that Huntington was in league with the defendants; second, that the Hulls, through Huntington, were the agents of the defendants; and, third, that the lands were entered by parties obtained by Hull for the use and benefit of the defendants and the land company, for the purpose of defrauding the government out of the title thereto. One of the Hulls testified that at one time Huntington said he thought he could sell some of the leases to the defendant Comstock. It must be conceded that, unless there was an existing conspiracy between all of the defendants and Huntington to effectuate what Huntington was seeking to compass through the Hulls, his statements made to them in the absence of the defendants were mere hearsay. There was no evidence of any direct dealing or understanding between any of the defendants and the Hulls. There is no evidence of Huntington having been authorized by the defendants to employ the Hulls, or to procure leases for them. There is no evidence that the defendants obtained any leases from the homesteaders obtained by the Hulls.

The dernier resort to justify the admission of this evidence is the statement of Irvine Hull that, when he took some of the entrymen procured by him to the office in Nebraska where the preliminary entry affidavits were made, Huntington and Comstock were there, and the same stenographer was used in preparing the declaratory statements. In the absence of any proof that Comstock furnished the money for making such proofs, without proof that the entries were made within or adjacent to the Spade Ranch, or that the defendants obtained the possession of any of said land so entered by the Hulls, I submit that in permitting the Hulls to detail in evidence all that Huntington said to them and what they said to the entrymen, in the absence of the defendants, is indefensible. To hold otherwise is to reverse the maxim of the law: "In favorem vitæ, liberatis, et innocentiæ, omnia præsumuntur." This court, in Vernon v. United States, 146 Fed. 121, 76 C. C. A. 547, said:

"* * * Assuming that the jury would be justified to draw either of the inferences, the rule of law is that in case of conflicting presumptions that which assumes innocence must be adopted."

So in United States Fidelity & Guaranty Co. v. Des Moines National Bank, 145 Fed. 273, 74 C. C. A. 553, the court said:

"A theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature and are so related to each other that it is the only conclusion that can fairly or reasonably be drawn from them. If the facts are consistent with either of two opposing theories, they prove neither."

And, therefore, as ruled in the Vernon Case, where a circumstantial incident was made the basis of a hypothesis of criminality, which was equally referable to an innocent act, it was held error for the trial court not to so declare as matter of law. This for the reason that:

"No inference of fact or of law is reliably drawn from premises which are uncertain." U. S. v. Ross, 92 U. S. 281, 283, 23 L. Ed. 707.

As prior to the date of the organization of the alleged conspiracy, and afterwards, Huntington, so far as the evidence shows, was acting independently of the Spade Ranch in securing locators on homestead lands, and selling leases obtained and to be obtained, and the Hulls, according to their own testimony, were acting for him under contract, and Comstock, according to the government's contention, was engaged in promoting entries in the interest of the Spade Ranch, the incident of Huntington and Comstock being in the town where their respective groups of men, in connection with hundreds of others not in question, were assembled, and the preliminary papers being prepared by the same stenographer, were reasonably referable to the promotion of their separate enterprises and to the nonexistence of any common assumed conspiracy.

The evidence shows that at the time there were about 400 men in line and about the registry office seeking to make entries. If a dozen or more of them had been taken by their attorney to the same office and scrivener as that used by Huntington, there would be just as much basis for the assumption of a conspiracy between such attorney and Huntington as between Huntington and these defendants. Mr. Justice Strong in Manning v. Insurance Co., 100 U. S., loc. cit. 697, 698, 25 L. Ed. 761, very appositely said:

"We do not question that a jury may be allowed to presume the existence of a fact in some cases from the existence of other facts which have been proved. But the presumed fact must have an immediate connection with or relation to the established fact from which it is inferred. If it has not, it is regarded as too remote. The only presumptions of fact which the law recognizes are immediate inference from facts proved."

In the recent case of Crawford v. United States (U. S. Supreme Court, October Term, 1908) 212 U. S. 203, 29 Sup. Ct. 268, 53 L. Ed. 465, Mr. Justice Peckham adverted to the cautiousness that should be exercised by courts in ruling upon the admissibility of remote circumstances in criminal prosecutions, dependent upon the testimony of persons sustaining the relation of particeps criminis to the case, and said:

"But a felon, being also a confessed accomplice, was thus produced by the government as a witness for the purpose of proving its case against defendant. * * * Without his evidence it would have been difficult, if not impossible, to convict the defendant. * * * The evidence of a witness, situated as was Lorenz, is not to be taken as that of an ordinary witness, of good character, in a case whose testimony is generally and prima facie supposed to be correct. * * * The facts surrounding this case make it particularly important that the rule in regard to material errors should be most rigidly adhered to. If it be not clear that no harm could have resulted from the commission of this material error, the judgment should be reversed."

If Huntington was a conspirator with the defendants in the transaction in question, so were the Hulls. In this, as throughout the trial, the government omitted the Hulls from the indictment and used them as witnesses, testifying under the strongest influences to be serviceable to the government in order to be more sure of their own immunity. Throughout this case there was a special reason why the court should apply the rule of strictissimi juris in respect to the admissibility of the facts detailed by such witnesses to raise a bare presumption. To indulge every presumption as in this case in favor of the government, under the cloak of circumstantial evidence, is, · in my judgment, to break down one of the great safeguards the law throws around the individual citizen.

## Entryman Ami B. Todd.

A number of entrymen connected with the homestead entries in question were obtained by said Todd. Todd is one of the defendants tried in the separate group with Huntington, but was not interested in or connected with the Spade Ranch. What he said to such entrymen and what they said to him was admitted in evidence against the defendants. He was furnished with more than 50 declaratory statements from old soldiers through one Mann. But only as to 8 of these entries is there any claim made of any connection with the defendants as charged in the indictment. These entrymen came from towns named Plattsmouth, Milford, and Quincy. As to the entrymen who came from Plattsmouth, there is not a particle of evidence to show any agreement to either lease or sell the lands to any one. While one of these entrymen, named Sage, testified that he did not intend to live on the land continuously, but was willing to do what was required, he said he was acting in good faith at the time of his entry. So of the entryman Duke. The entryman Thrasher testified that, while he intended to take his family out there and live on the land, he did not intend to break up his home at Plattsmouth. He is the only one who made any inquiry of any of the defendants about living on the land. Richards wrote to Todd that Thrasher should bring his wife up and stay some time on the land. Jameson wrote him that, if he proposed to prove up, he must move his family there. But there was no agreement that their entries were to be made, or were made, for the benefit of the defendants, or that they or the land company were to obtain the title to the land. In the absence of such testimony there was an utter failure of proof to sustain the essential allegation of the indictment in respect of these transactions. The only possible predicate for the verdict of guilty as to those transactions is that the jury should be indulged to draw any inference they pleased from any sort of a premise.

While some of these entrymen testified that after they saw the land. they would not live on it and did not intend to prove up on it, there was no evidence that any such statement was made by the entrymen to any of the defendants at the time of their procurement; and I am unable to find anything in their testimony to warrant a conviction on the ground that there was any agreement or understanding between

them and the defendants that they were to make the entries in order to transfer the title when obtained to the defendants or the land company.

In the case against the defendant Triplett, I cannot escape the impression that this man was convicted on mere suspicion. It is a mere matter of conjecture that the entrymen obtained by Triplett had any connection whatever with the other defendants. There is no other evidence connecting him with the other entries obtained through Todd, McElroy, or other parties charged to have connection with the other defendants. No improvements were made on any of the land by Triplett. One entryman, named Green, testified that Triplett was to make the improvements for him.

"Q. Do you remember whether there was anything said as to improvements? A. Well, sir, Mr. Triplett was to put the improvements on it, and after it was proved up on he was to sell to Richards and Comstock— Well, if he could get more money from some one else, why he would have sold it to some one else."

As there was no evidence that Triplett ever consummated any arrangement with the land company, but only some statements as to what he hoped to do in respect to entries, there was no substantial evidence to warrant the court in submitting to the jury, as to Triplett, the question of fact as to whether he was in league with the defendants to obtain title to the lands for their use and benefit. The lesser punishment imposed by the court upon this man evidenced the court's grave doubt as to his guilt; and the court should have protected him against the consequences of subjecting his case to the whole mass of evidence respecting a multiform of transactions with which he had no manner of connection. Had he been tried alone upon an indictment against him charging him with procuring entries under the homestead law for the purpose of defeating the government out of its title to the lands, it is inconceivable that any reasonable jury could have returned a verdict of guilty against him; whereas, he was found guilty upon about 35 counts.

### Rejection of Affidavits of Certain Entrymen.

The instance of the witness Smith M. Child is illustrative of the question involved. On the examination of this witness by the government, he was inquired of as to whether or not he entered or filed on the land described in his homestead entry as a homestead for himself. To which he answered: "No, sir." This question and answer were objected to by the defendants, on the ground that the undisclosed mind of the witness ought not to affect the defendants. On his cross-examination an affidavit made by him on the 31st day of July, 1906, was shown him, and he stated the signature was his. Thereupon counsel for the defendants offered the affidavit in evidence as a part of the cross-examination. The objection interposed thereto was that it was incompetent and irrelevant; the witness' attention not having been called to any part of it except the signature. Counsel for the defendants said he would make that clear, and called the attention of the witness to the whole document so he could read it over, which the witness did. Thereupon, the offer to put it in evidence was renewed. Objection was then made:

"That the witness' attention has not been directed to the particular parts of the same.

"The Court: I think the objection should be sustained. I think, before it can go in as a part of the cross-examination, he should be interrogated about it."

Then counsel for the defendant said:

"I suppose the test is, whether it tends to contradict anything that he has said.

"The Court: I think that is right, but I do not think it tends to contradict anything that he has testified to.

"Counsel for Defendant: Well, do I understand that it is on that ground that it is excluded?

"The Court: Yes, sir."

The ultimate statement of the court being that the affidavit was excluded for the reason that, if admitted, it did not tend to contradict anything the witness had testified to, it obviated the necessity, if any, of interrogating the witness as to any particular part of the paper. The rule of practice, both legally and ethically, after such pronouncement by the court, is for counsel to submit thereto, without more. As said by the Supreme Court of Arkansas in St. Louis, etc., Ry. v. Faisst, 68 Ark. 587, 598, 61 S. W. 374, 377, 378:

"Without any suggestion to the contrary, appellant had the right to assume, under the circumstances, that such was the view of the court, and hence it was not incumbent upon it to again offer it when it had opened its case."

So this court has said:

"The court having thus barred it from the consideration of the jury for any purpose, after it was pressed for consideration, it was neither respectful nor necessary for defendant's counsel to urge it in any other manner to secure the benefit of the exception taken to the court's ruling." Nurnberger v. U. S., 156 Fed. 721, 730, 84 C. C. A. 377; Long-Bell Lumber Co. v. Stump, 86 Fed. 574, 583, 30 C. C. A. 260, 269; Glover v. U. S., 147 Fed. 426, 431, 77 C. C. A. 450, 543.

Aside from this, I understand the proper practice to be that, where it is proposed to contradict the testimony of the witness by showing that in a letter or affidavit he has made a contradictory statement, it is sufficient, after the signature to the written instrument is conceded, not to interrogate the witness further about it; and it may be offered on cross-examination without further delay. 2 Broderip & Bingham, 286, 6 Eng. Com. Law R. 148; Toplitz v. Hedden, 146 U. S. 255, loc. cit., 13 Sup. Ct. 70, 36 L. Ed. 961; O'Riley v. Clampet, 53 Minn. 539, 55 N. W. 740; Romerteze v. East River Nat. Bank, 49 N. Y. 577; Hennessey v. Metropolitan Life Ins. Co., 74 Conn. 699–707, 52 Atl. 490; Hanlon v. Ehrich, 178 N. Y. 485, 71 N. E. 12; 2 Wigmore on Evidence, § 1261; 1 Greenleaf on Evidence (16th Ed.) § 456.

No objection was made to the offer to put in the letter as a part of the cross-examination. The whole contention of the government was that these witnesses did not make an entry of this land in good faith for their own use and benefit, but for the benefit of other parties; and as the Child entry had reference to the Thomas Huntington entries, the witness stated in the affidavit that he had never made any statement that the entries were for the benefit of Huntington or the Maverick Loan & Trust Company, that he made the entry for his own exclusive use and benefit and in good faith, that he had no contract

or agreement with Thomas Huntington or any other person to sell or dispose of the title which he might acquire from the government in whole or in part, and that he did not make his entry on speculation for the use and benefit of any other person. If this was not in its substantive effect a direct contradiction of his evidence that he did not make the entry of this land for his own use and benefit as a homesteader, I am unable to comprehend the force of evidence.

### Weiford and Noble Affidavits.

The government's counsel was indulged by the court to place before the jury the applications for homestead entries made by one Weiford and one Noble. No count of the indictment was predicated of these entries, and not a single entryman or other witness testified respecting them. Whether they were true or false did not appear. The admission of these entries under such circumstances before the jury was calculated to create in their minds the impression that there must be something wrong about those entries; otherwise, the representative of the government would not have insisted on getting them before the jury. The only answer possible to such conduct on the trial of a criminal case is the stereotyped suggestion that it was harmless error. In looking over this record, and the multiplied instances of improper matters gotten before the jury, I wonder how many repetitions of such so-called harmless errors are required to constitute one vital error. In Miller v. Territory of Oklahoma, 149 Fed. 339, 79 C. C. A. 277, speaking of a germane matter, this court said:

"The zeal, unrestrained by legal barriers. of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty, where they have prestige enough to induce the trial court to give them latitude. When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced the minds of the jury. The reply the law makes to such suggestion is that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless. As the appellate court has not insight into the deliberations of the jury room. the presumption is to be indulged, in favor of the liberty of the citizen. that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty."

Because it would be very dangerous for the appellate court to undertake, in many cases, to determine what evidence did or did not influence the jury, especially in repeated instances of such improper matters getting before them, probably influencing their judgments by the very number of the instances admitted on the insistence of the prosecution, the rule should here be rigidly applied "that there is a presumption of harm arising from the existence of an error committed by the trial court against the party complaining"; and, unless it be decisively shown without doubt from the record that there was no harm in the commission of such error, the judgment should be reversed. Crawford v. United States, supra; Deery v. Cray, 5 Wall. 795, 18 L. Ed. 653; Smith v. Shoemaker, 17 Wall. 630, 639, 21 L. Ed. 717; Choctaw, O. & G. R. Co. v. Holloway, 114 Fed. 458, 52 C. C. A. 260; U. S. v. Gentry, 119 Fed. 70, 55 C. C. A. 658.

## Hearsay Testimony.

Another cumulative instance of so-called harmless error was the testimony of the witness Creager, an entryman, who testified that on returning to Gordon they got a team to go out to see the land. Asked if he saw the same land as before, he answered that they went on to a hill where they saw some ranches, but he could not tell whether any land they had entered was within 25 miles of it or not.

"Q. Was there any one of these buildings that were pointed out to you as being on your place? A. They said that it was supposed to be our place. Q. Well, was there any one that pointed it out to you? A. Not in particular."

Who "they" were so pointing out the land was not shown. It was, not shown that they had any connection with the defendants, or that from their position and duty they were authorized to speak for them. The person speaking may have been the mere driver of the vehicle hired for that purpose. It would not come within the purview of his employment to make statements for or against the defendants. Most certainly it was requisite, as preliminary to this statement, to show that the party making it was the agent or representative of the defendants. It does not now lie in the mouth of the prosecutor to say that this was quite immaterial. He was seeking to show, what he deemed to be an important part of his case, that the houses put on the land entered were the work of the defendants, and he thought it important to get this fact after this fashion before the jury. The criticism made upon such hearsay testimony by this court in Thomas v. U. S., 156 Fed. 914, 915, 84 C. C. A. 477, 17 L. R. A. (N. S.) 720, is most apposite.

## The Incident of the Map and Conduct of Counsel.

It was a prominent contention on the part of the government that the defendants were interested in having homestead entries made for the use and benefit of the Spade Ranch, and that a large number of entries were made within the range of the Nebraska Land & Feeding Company. Counsel for the government recognized the importance of having it made to appear to the jury that surrounding this ranch, including land subject to homestead entries, was an immense fence. To this end the government had a surveyor sent out, preparatory to the trial, who made a diagram indicating thereon fences so circumscribing the lands. This map was exhibited to witnesses on the stand, and their attention in the presence of the jury was called to this purported fence. When the fact was developed that there were or had been a number of cross-fences, tending to show that it was not a continuous and single inclosure, and because the map did not disclose that fact, the court properly excluded it from evidence. Notwithstanding this ruling of the court, the prosecuting attorney afterwards exhibited this map to another witness on the stand in the presence of the jury, calling his attention to the diagram showing such fences all around the lands. On objection, the court again refused to allow the witness to be examined about the matter. In the face of all this, counsel for the government in argument to the jury referred to this map and asserted: "It is an actual map, as Mr. Alt (the surveyor) says, and a correct

175 F.—60

survey." It is trifling with the common sense of observation to say that the jury did not see the map. The fact that the map was exhibited to the witnesses in the presence of the jury, indicating that the survey made by Alt showed a fence extending all around the area in question, accompanied with the assertion of counsel, can leave no ground of controversy that the jury understood its purport and effect. This conduct and statement of the counsel being objected to, the only observation of the court was that the map was not in evidence. This did not suppress nor silence counsel, who replied: "I am not exhibiting the map or quoting from it." Of what avail was such statement as that in the face of the prosecuting attorney, clothed with the authority and dignity of his high office, who asserted: "It is an actual map, as Mr. Alt says, and a correct survey." When defendants' counsel again objected, the only response of the court was: "The record may show an exception." This offense ought not now to be palliated by the suggestion that probably the map was competent evidence; for, had the court admitted it, the defendants might have introduced testimony in rebuttal in explanation or contradiction of it, but when ruled out by the court defendants' counsel had the right to assume that it was the end of the incident. The court neither reprimanded counsel nor directed the jury to disregard his statement.

The whole trend of the highest authorities is that such conduct on the part of counsel in a criminal prosecution is and ought to be reversible error. In Union Pacific R. R. Co. v. Field, 137 Fed. 14, 69 C. C. A. 536, the court animadverted upon such conduct of counsel in a civil case, and quoted with approval the Supreme Court of Wisconsin, in Brown v. Swineford, 44 Wis. 287–293, 28 Am. Rep. 582:

"If counsel persevere in arguing upon pertinent facts not before the jury, exception may be taken by the other side, which may be good ground for a new trial, or for a reversal in this court."

In Waldron v. Waldron, 156 U. S. 361–380, 15 Sup. Ct. 383, 388, 39 L. Ed. 453, the court said the act of counsel, commenting in argument upon testimony which had been excluded, may not have been cured by direction to the jury not to consider such fact. Mr. Justice White, inter alia, said:

"It is unnecessary to say that all this is ground for reversal, unless its legal effect be in some way overcome. It is elementary that the admission of illegal evidence, over objection, necessitates reversal, and it is equally well established that the assertion by counsel in argument of facts no evidence whereof is properly before the jury, in such a way as to seriously prejudice the opposing party, is, when duly excepted to, also ground therefor."

In the leading case of Tucker v. Henniker, 41 N. H. 317–322, the court said:

"The jury are sworn to render a true verdict in every case, according to the law and the evidence given them, and the well-established rule of judicial proceedings confines the arguments of counsel before them to comments upon and suggestions in relation to that law and evidence. It would seem utterly vain and quite useless to caution jurors in the progress of a trial against listening to conversations out of the courtroom in regard to the merits of a cause, if they are to be permitted to listen in the jury box to statements of facts calculated to have a bearing upon their judgment, enforced and illustrated by all the eloquence and ability of learned, zealous, and interested counsel."

In State v. Woolard, 111 Mo. 248–255, 20 S. W. 27, 29, the prosecuting attorney, in replying to statement of witness on the stand as to what the prosecuting attorney had said about releasing him, said:

"Mr. Scott told the witness Brown that all he wanted was the truth. * * * Scott made no promise to the witness Brown to induce him to testify."

There being no evidence to this effect, the court said:

"This was highly improper. It was not in evidence. It is exceedingly probable that it is true, but Mr. Scott should have gone on the stand and testified to the fact, if it was permissible; but, even if it was not, it would not justify counsel in stating it, even though the court had refused to let him testify."

Such conduct and statement by counsel of high character and in high position are much more reprehensible, and the courts are more inclined on that very account, to make such misconduct reversible error. Gibson v. Zeibig, 24 Mo. App. 65–72. Where prosecuting counsel in their zeal, after such a fashion as in this case, direct the attention of the jury to a piece of excluded testimony and assert it to be a fact, in the absence of a positive reprimand of the court, accompanied with direction to the jury to disregard it, as the government's counsel by such act assumed that it would be helpful in securing a verdict of guilty, he should be deprived of his victory by the court setting aside the verdict. This is the effectual correction of such abuse.

## Instruction as to Perjury.

The charge of the court was that to constitute perjury the party must have taken an oath before some competent tribunal, etc.,

"when in fact some material matter so testified, declared, or certified to by him is false and untrue, and known by the party at the time of taking such oath to have been false and untrue. * * * To constitute perjury it is not sufficient that the oath so taken be false and untrue as to some material matter, but it must further appear that the party knew at the time of taking his oath that the same was false and untrue."

The vice of this definition is in omitting that the party should have sworn falsely "willfully." The text-books and all the authorities known to me include in the definition the word "willfully." It has a distinctive office in the definition of this crime, for which there is no substitute in law. It is the descriptive term of the corrupt mind, of the evil intent. The indictment itself, in order to comply with the requirements of the federal statute, must allege that the act was done willfully. The statute (section 2294) respecting the affidavit in question declares "that if any witness making such proof, or any applicant making such affidavit or oath, shall knowingly, willfully, or corruptly swear falsely to any material matter, etc., shall be deemed guilty of perjury": thus showing that in the mind of the lawmaker, the terms "knowingly and willfully" have their separate, distinctive office.

- In Nurnberger v. United States, 156 Fed. 735, 84 C. C. A. 391, the court said:

"The very gist of the crime of perjury is made by the statute itself to depend upon the fact that the oath made should not only be false, but the falsehood must have been willfully and corruptly asserted. So if the affidavit made or procured was in ignorance of its contents, or under a misapprehension of

its purpose, no matter how culpably negligent in a civil action the party might be, he could not be convicted of perjury, because the act was wanting in the required willfulness and corruption."

It is not a good answer to this in my judgment to say that in the preceding part of the charge the court read to the jury the statute, which uses the word "willfully" as a definition of the crime. As the court subsequently in its charge, in explaining to the jury the essentials of the crime, omitted the term "willfully," the presumption should be indulged in favor of the defendants that the jury rather gave heed to the exposition given by the court to the statute. Nor is it maintainable on reason or authority that the phrase "the party knew at the time of taking his oath that the same was false and untrue" is the equivalent of the term "willfully," as that language only brought into consideration the knowledge of the affiant, which trials under this statute demonstrate to be a mere matter of information or understanding of the law among the entrymen. As the term "willfully" in the charge of perjury has become canonized in the definition of the law as expressive of the corrupt mind and wicked intent, it will establish a dangerous precedent for a court of this high jurisdiction to justify said instruction, thereby substituting some other expression, which may or may not convey the legal sense of the term employed in the statute.

### Acts or Statements by One of the Conspirators.

The court in its charge made the following statements, which were separately excepted to:

"The principle of law and rule of evidence is that when once a conspiracy or combination is established, and the defendant's connection therewith is shown by independent evidence, that he is bound by the acts, declarations, and statements of his co-conspirators, because in that event he is deemed to assent to or command what is done by any other in furtherance of the common object. * * * *"

"If you find that he [that is, one of the defendants] was a party to such conspiracy, then the statements and declarations of his co-conspirators may be considered as if made by him. * * * *"

"Should you find that a conspiracy existed, and that the defendants were parties thereto, then you should inquire whether or not one or more of the parties to such conspiracy did the act or acts in pursuance or in furtherance of such conspiracy as is charged in the indictment, which acts I have denominated and called the 'overt acts'; for, although a conspiracy may have existed, unless some one or more of the overt acts charged in the indictment are established to have been committed by one or more of the conspirators, the offense charged in the indictment would not be established."

The fatal objection to this charge was the failure to recognize and declare the established rule that, while whatever is said or done by either one of the parties may bind the others, it must be said or done in furtherance of the common design; and, therefore, the books say:

"Evidence as to what was said or done by the other conspirators must be limited to their acts and declarations made and done while the conspiracy was pending, and in furtherance of the design; what was said or done by them before or afterwards not being within the principle of admissibility." Wright & Carson on Crim. Conspiracies and Agreements, p. 128.

So the Supreme Court in Wiborg v. United States, 163 U. S., loc. cit. 657, 16 Sup. Ct. 1137, 1197, 41 L. Ed. 289, and Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429, said:

"The declarations must be made in furtherance of the common object, or must constitute a part of the res gestæ of acts done in such furtherance."

Greenleaf on Evidence (15th Ed.) vol. 3, p. 94, asserts the rule to be that:

"Evidence of what was said or done by the other conspirators must be limited to their acts and declarations made and done while the conspiracy was pending, and in furtherance of the design."

The charge of the court was not so limited and guarded. From its terms the jury might well have concluded that any statements, made by any of the alleged conspirators, at any time or place, should be attributed to and bind all of the other defendants, regardless of the fact as to whether it was part of the res gestæ, made in furtherance of the common design, or was a mere narration.

Instruction No. 23 requested by the defendants, is as follows:

"Notwithstanding you may believe that some of the entrymen may, at the time they made their entries, have had an intention not to live on the land embraced therein, the fact that they had intention to live thereon is not material for your consideration in determining whether or not the defendants were acting fraudulently, unless you find that such intention not to live on the land was actually known to the defendants before or at the time such entry was made. It is not sufficient for you to surmise or suspect such knowledge on their part, but you must be satisfied from the evidence, beyond a reasonable doubt, that the defendants had such actual knowledge at the time such entries were made."

The court refused this instruction, and the only relevant instruction given is as follows:

"The jury are instructed that the fact that somebody in the course of the proceedings before the United States Land Department has made a false statement or false affidavit is not chargeable or imputable to the defendants, unless it is shown by the testimony clearly and unmistakably and beyond a reasonable doubt that the defendants in this case knew of the fact that such affidavit was false, and procured it to be made with such knowledge."

This instruction is a mere generality. It refers only to false statements or affidavits made by somebody before the Land Department. The jury might well have been left to mere speculation as to what it was directed; whereas, the instruction requested by the defendants, and which was vital, went directly to the testimony of some of the entrymen, who were permitted to testify that they did not intend to live upon the land in question. It is a wholesome rule, stated by Mr. Justice Story, in Livingston v. Maryland Insurance Company, 7 Cranch, 544, 3 L. Ed. 421, that if in point of law the party is entitled to the direction by the court touching a specific matter, it is error to refuse it, although the direction afterwards given by the court might, by inference and argument, in the opinion of the court be pressed to the same extent.

"The party has a right to a direct and positive instruction; and the jury are not to be left to believe in distinctions, where none exist, or to reconcile propositions, by mere argument and inference. It would be a dangerous practice, tending to mislead, instead of enlighten, the jury." Cahn v. Reid, 18 Mo. App. 135; Thompson on Charging Juries, § 78.

There are other incidents connected with the trial complained of by the defendants not unworthy of consideration; but a discussion of them would unduly prolong this already extended dissent.

In my judgment, the defendants were not accorded that fair and impartial trial guaranteed them by the Constitution, and, therefore, the judgment should be reversed.